CHICAGO & NORTH WESTERN TRANSPORTATION
CO. *v.* KALO BRICK & TILE CO.

No. 79-1336.  Argued December 9, 1980—Decided March 9, 1981

MARSHALL, J., delivered the opinion for a unanimous Court.

*Bruce E. Johnson* argued the cause for petitioner. With him on the briefs were *Louis T. Duerinck, James P. Daley, Stuart F. Gassner,* and *Frank W. Davis, Jr.*

*M. Gene Blackburn* argued the cause for respondent. With him on the brief was *Ned Alan Stockdale.*

*Henri F. Rush* argued the cause for the United States et al. as *amici curiae* urging reversal. With him on the brief were *Solicitor General McCree, Deputy Solicitor General Geller, Edwin S. Kneedler, Richard A. Allen,* and *Charles A. Stark.*

JUSTICE MARSHALL delivered the opinion of the Court.

Through the Interstate Commerce Act and its amendments, Congress has granted to the Interstate Commerce Commission authority to regulate various activities of interstate rail carriers, including their decisions to cease service on their branch lines. Under Iowa state law, a shipper by rail who is injured as the result of a common carrier's failure to provide adequate rail service has available several causes of action for damages. In this case we are called upon to decide whether these state-law actions may be asserted against a regulated carrier when the Commission has approved its decision to abandon the line in question.

## I

Petitioner, an interstate common carrier by rail, is subject to the jurisdiction of the Interstate Commerce Commission. For some time prior to April 1973, petitioner operated a 5.6-mile railroad branch line between the towns of Kalo and Fort Dodge in Iowa. Respondent operated a brick manufacturing plant near Kalo, and used petitioner's railroad cars and branch line to transport its products to Fort Dodge and outward in interstate commerce.[1]

---

[1] Respondent used petitioner's branch line only for the shipment of bricks that were traveling in interstate commerce. All of the bricks that respondent shipped intrastate traveled by truck.

During the 1960's, the tracks on the Kalo-Fort Dodge branch line were damaged by three mud slides. Petitioner made repairs after the first two slides, but following the last slide in 1967, when portions of the embankment wholly vanished under the waters of the Des Moines River, petitioner decided to stop using the branch line. Petitioner instead leased part of another railroad's parallel branch line to connect Kalo with Fort Dodge. In April 1973, the leased line was also damaged by a mud slide. By that time, respondent was the only shipper using the Kalo-Fort Dodge line. After inspecting the damage to the leased line, petitioner decided not to repair it. Petitioner then notified respondent that it would no longer provide service on the Kalo-Fort Dodge line, although it would continue to make cars available at Fort Dodge if respondent would ship its goods there by truck. Respondent determined that shipment by truck was not economically feasible, and notified its customers that it would complete existing contracts and then go out of business.[2]

In November 1973, petitioner filed with the Commission an application for a certificate declaring that the public convenience and necessity permitted it to abandon the Kalo-Fort Dodge branch line. The United States Government intervened in support of petitioner's application. Respondent was the sole party appearing in opposition to the request, but failed to perfect its filing before the Commission.[3] In a

---

[2] It is undisputed that at this time, petitioner had not made a decision whether to abandon the Kalo-Fort Dodge branch line. An abandonment "is characterized by an intention of the carrier to cease permanently or indefinitely all transportation service on the relevant line." *ICC* v. *Chicago & N. W. Transp. Co.*, 533 F. 2d 1025, 1028 (CA8 1976). See *ICC* v. *Chicago, R. I. & P. R. Co.*, 501 F. 2d 908, 911 (CA8 1974), cert. denied, 420 U. S. 972 (1975). An embargo, by contrast, is a temporary emergency suspension of service initiated by filing of a notice with the Commission. *ICC* v. *Chicago & N. W. Transp. Co., supra,* at 1027, n. 2.

[3] In particular, respondent "did not file a verified statement in opposition as required," and was therefore "deemed to be in default and en-

decision issued in April 1976, the Commission found that petitioner had abandoned the line due to conditions beyond its control and granted the request for a certificate. *Chicago & N. W. Transp. Co. Abandonment*, AB1, Sub. No. 24 (Jan. 11, 1976), App. to Pet. for Cert. 34a. Respondent made no attempt to comply with the provisions of the Interstate Commerce Act regarding judicial review of the Commission's decision.[4] Instead, while the abandonment request was still pending before the Commission, respondent filed this damages action against petitioner in state court. The complaint alleged that petitioner had violated Iowa Code §§ 479.3, 479.122 (1971) and state common law by refusing to provide cars on the branch line, by negligently failing to maintain the roadbed, and by tortiously interfering with respondent's contractual relations with its customers.[5] The state trial

---

titled to no further formal proceedings." *Chicago & N. W. Transp. Co. Abandonment*, AB1, Sub. No. 24 (Jan. 11, 1976), App. to Pet. for Cert. 34a–35a. The reason for this default, according to respondent, was that it had gone out of business and therefore had no continuing interest in forcing petitioner to continue its service on the branch line.

[4] See 28 U. S. C. §§ 2321 (a), 2342 (5), 2343, 2344.

[5] Iowa Code § 479.3 (1971) provides in relevant part:

"Every railway corporation shall upon reasonable notice, and within a reasonable time, furnish suitable cars to any and all persons who may apply therefor, for the transportation of any and all kinds of freight, and receive and transport such freight with all reasonable dispatch . . . ."

Iowa Code § 479.122 (1971) provides:

"Every corporation operating a railway shall be liable for all damages sustained by any person, including employees of such corporation, in consequence of the neglect of the agents, or by any mismanagement of the engineers, or other employees thereof, and in consequence of the willful wrongs, whether of commission or omission, of such agents, engineers, or other employees, when such wrongs are in any manner connected with the use and operation of any railway on or about which they shall be employed, and no contract which restricts such liability shall be legal or binding."

The conclusion that these statutes create a state-court damages action for failure to provide proper service is not a new one under Iowa law. See,

court, holding that the Interstate Commerce Act wholly pre-empted state law as to the matters in contention, dismissed the action. The Iowa Court of Appeals reversed, ruling that state abandonment law was not pre-empted and that the state and federal schemes represented "complimentary [sic], alternative means of relief for injured parties." [6]   295 N. W.

e. g., *Baird Bros.* v. *Minneapolis & St. L. R.,* 181 Iowa 1104, 165 N. W. 412 (1917).

After respondent filed its state-court action, petitioner sought to remove the case to federal court, but the federal court, finding that diversity of citizenship was lacking, remanded the case to state court. The Iowa Court of Appeals correctly held that this federal-court ruling had no rele-vance to its inquiry into whether the pre-emption doctrine barred the state courts from exercising their jurisdiction. 295 N. W. 2d 467, 468–469 (1979). See *Brancadora* v. *Federal Nat. Mortgage Assn.,* 344 F. 2d 933, 935 (CA9 1965); *Alaska* v. *K & L Distributors, Inc.,* 318 F. 2d 498, (CA9 1963).

[6] The Iowa court also held the doctrine of primary jurisdiction, in the sense of initial deferral to the expertise of the Commission, had no appli-cation to this litigation. 295 N. W. 2d, at 471–472. Petitioner, as well as the United States and the Commission as *amici curiae,* argues that the primary-jurisdiction doctrine precludes respondent's suit on the facts of this case, but we have no occasion to address that question.   Although we agree with petitioner and *amici* that the Commission has special ex-pertise in the matters respondent wishes to raise in state court, see *infra,* at 326–327, and n. 14, we do not rely on the primary-jurisdiction doctrine. As we have stated in interpreting another provision of the Interstate Com-merce Act: "[T]he survival of a judicial remedy . . . cannot be determined on the presence or absence in the Commission of primary jurisdiction to decide the basic question on which relief depends.  Survival depends on the effect of the exercise of the remedy upon the statutory scheme of regu-lation." *Hewitt-Robins Inc.* v. *Eastern Freight-Ways, Inc.,* 371 U. S. 84, 89 (1962).   Even if the primary-jurisdiction doctrine were applicable here, it would at best require the state courts to postpone any action until the Commission had an opportunity to address the administrative ques-tions raised in the civil damages action.  But here, the Commission has actually ruled, and the state trial on liability and damages has not yet taken place.  Consequently, the requirements of the doctrine have been complied with in spirit, even if not through any intent of respondent. We save for a later case a decision on the proper application of the pri-mary-jurisdiction doctrine when the Commission has not yet ruled.

2d 467, 469 (1979). After the Supreme Court of Iowa denied petitioner's application for review, we granted certiorari, 446 U. S. 951 (1980). We reverse.

## II

Pre-emption of state law by federal statute or regulation is not favored "in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142 (1963). See *De Canas* v. *Bica*, 424 U. S. 351, 356 (1976). The underlying rationale of the pre-emption doctrine, as stated more than a century and a half ago, is that the Supremacy Clause invalidates state laws that "interfere with or are contrary to, the laws of congress . . . ." *Gibbons* v. *Ogden*, 9 Wheat. 1, 211 (1824). The doctrine does not and could not in our federal system withdraw from the States either the "power to regulate where the activity regulated [is] a merely peripheral concern" of federal law, *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 243 (1959), or the authority to legislate when Congress could have regulated "a distinctive part of a subject which is peculiarly adapted to local regulation, . . . but did not," *Hines* v. *Davidowitz*, 312 U. S. 52, 68, n. 22 (1941). But when Congress has chosen to legislate pursuant to its constitutional powers, then a court must find local law pre-empted by federal regulation whenever the "challenged state statute 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Perez* v. *Campbell*, 402 U. S. 637, 649 (1971), quoting *Hines* v. *Davidowitz*, *supra*, at 67. Making this determination "is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict." *Perez* v. *Campbell*, *supra*, at 644. And in deciding whether any conflict is present, a court's concern is necessarily with "the nature of the activities

which the States have sought to regulate, rather than on the method of regulation adopted." *San Diego Building Trades Council* v. *Garmon, supra,* at 243.

The Interstate Commerce Act is among the most pervasive and comprehensive of federal regulatory schemes and has consequently presented recurring pre-emption questions from the time of its enactment. Since the turn of the century, we have frequently invalidated attempts by the States to impose on common carriers obligations that are plainly inconsistent with the plenary authority of the Interstate Commerce Commission or with congressional policy as reflected in the Act. These state regulations have taken many forms. For example, as early as 1907, the Court struck down a State's common-law cause of action to challenge as unreasonable a rail common carrier's rates because rate regulation was within the exclusive jurisdiction of the Commission, and a state-court action "would be absolutely inconsistent with the provisions of the act." *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426, 446. Similarly, in *Transit Comm'n* v. *United States,* 289 U. S. 121, 129 (1933), we held that the Interstate Commerce Commission's statutory authority to regulate extensions of service was exclusive and therefore stripped a similar state commission of all power to act in the same area. More recently, in *Chicago* v. *Atchison, T. & S. F. R. Co.,* 357 U. S. 77 (1958), we held that a city ordinance requiring a license from a municipal authority before a railroad could transfer passengers, an activity also subject to regulation under the Interstate Commerce Act, was facially invalid as applied to an interstate carrier. "[I]t would be inconsistent with [federal] policy," we observed, "if local authorities retained the power to decide" whether the carriers could do what the Act authorized them to do. *Id.,* at 87. The common rationale of these cases is easily stated: "[T]here can be no divided authority over interstate commerce, and . . . the acts of Congress on that subject are supreme and exclusive." *Missouri Pacific R. Co.* v. *Stroud,*

267 U. S. 404, 408 (1925). Consequently, state efforts to regulate commerce must fall when they conflict with or interfere with federal authority over the same activity.

## III

In deciding whether respondent's state-law damages action is pre-empted, we must determine what Congress has said about a carrier's ability to abandon a line, what Iowa state law provides on the same subject, and whether the two are inconsistent. To these tasks we now turn.

## A

The Interstate Commerce Commission has been endowed by Congress with broad power to regulate a carrier's permanent or temporary cessation of service over lines used for interstate commerce. Under §§ 1 (4) and 1 (11) of the Interstate Commerce Act, recodified at 49 U. S. C. §§ 11101 (a) and 11121 (a) (1976 ed., Supp. III),[7] the Commission is empowered both to pass on the reasonableness of a carrier's temporary suspension of its service and, if necessary, to order it resumed. See *ICC* v. *Chicago & N. W. Transp. Co.*, 533 F. 2d 1025, 1027, n. 2 (CA8 1976); *ICC* v. *Maine Central R. Co.*, 505 F. 2d 590, 593–594 (CA2 1974). In addition, and most relevant here, the Act endows the Commission with broad authority over abandonments, or permanent cessations of service.

The Commission's power to regulate abandonments by rail carriers stems from the Transportation Act of 1920, ch. 91,

---

[7] Under Pub. L. 95–473, 92 Stat. 1337, the Interstate Commerce Act and its various amendments have been completely recodified as Subtitle IV of Title 49 of the United States Code. In the main, this recodification is without substantive change. In this opinion, we cite to the original Act for ease in referring to the decision below and to our precedents. Where appropriate, we also give parallel cites to the Act as recodified.

41 Stat. 477–478, which added to the Interstate Commerce Act a new § 1 (18), recodified at 49 U. S. C. § 10903 (a) (1976 ed., Supp. III). That section stated in pertinent part:

> "[N]o carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment."

This section, we have said, must be "construed to make federal authority effective to the full extent that it has been exerted and with a view of eliminating the evils that Congress intended to abate." *Transit Comm'n* v. *United States, supra,* at 128. Among those evils is "[m]ultiple control in respect of matters affecting [interstate railroad] transportation," because such control, in the judgment of Congress, has proved "detrimental to the public interest." 289 U. S., at 127. See *Chicago* v. *Atchison, T. & S. F. R. Co., supra,* at 87. Consequently, we have in the past concluded that the authority of the Commission to regulate abandonments is exclusive. *Alabama Public Service Comm'n* v. *Southern R. Co.,* 341 U. S. 341, 346, n. 7 (1951). See *Colorado* v. *United States,* 271 U. S. 153, 164–166 (1926). The Commission's authority over abandonments is also plenary. So broad is this power that it extends even to approval of abandonment of purely local lines operated by regulated carriers when, in the Commission's judgment, "the over-riding interests of interstate commerce requir[e] it." *Palmer* v. *Massachusetts,* 308 U. S. 79, 85 (1939). The broad scope of the Commission's authority under § 1 (18) has been clear since the Court first interpreted that provision in *Colorado* v. *United States, supra.* There, the Court rejected a challenge by the State of Colorado to the power of the Commission to grant a certificate permitting an abandonment of a wholly intrastate

branch line operated by an interstate carrier. Justice Brandeis wrote for the Court:

"Congress has power to assume not only some control, but paramount control, insofar as interstate commerce is involved. It may determine to what extent and in what manner intrastate service must be subordinated in order that interstate service may be adequately rendered. The power to make the determination inheres in the United States as an incident of its power over interstate commerce. The making of this determination involves an exercise of judgment upon the facts of the particular case. The authority to find the facts and to exercise thereon the judgment whether abandonment is consistent with public convenience and necessity, Congress conferred upon the Commission." 271 U. S., at 165–166.

The exclusive and plenary nature of the Commission's authority to rule on carriers' decisions to abandon lines is critical to the congressional scheme, which contemplates comprehensive administrative regulation of interstate commerce. In deciding whether to permit an abandonment, the Commission must balance "the interests of those now served by the present line on the one hand, and the interests of the carrier and the transportation system on the other." *Purcell* v. *United States,* 315 U. S. 381, 384 (1942). Once the Commission has struck that balance, its conclusion is entitled to considerable deference. "The weight to be given to cost of a relocated line as against the adverse effects upon those served by the abandoned line is a matter which the experience of the Commission qualifies it to decide. And, under the statute, it is not a matter for judicial redecision." *Id.,* at 385.

The breadth of the Commission's statutory discretion suggests a congressional intent to limit judicial interference with the agency's work. The Act in fact spells out with considerable precision the remedies available to a shipper who is

injured either by the Commission's approval of an abandon-
ment or by a carrier's abandoning a line without securing
Commission approval. A shipper objecting to an abandon-
ment may ask the Commission to investigate the carrier's
action. § 13 (1), recodified at 49 U. S. C. § 11701 (b) (1976
ed., Supp. III). A shipper may also oppose any request for
abandonment filed before the Commission. 49 CFR § 1121.36
(1980).[8] If ultimately dissatisfied with the Commission's ac-
tion, a shipper may seek review of its action in the appropri-
ate court of appeals, 28 U. S. C. §§ 2321 (a), 2342 (5). In
addition, at the time that this action was filed in state court,
§ 1 (20) of the Act expressly provided that a shipper be-
lieving a carrier's abandonment was unlawful could seek an
injunction against it.[9] There is no provision in the Act for a
civil damages action against a carrier for an abandonment

---

[8] A carrier who files an application for a certificate permitting aban-
donment must make reasonable efforts to give notice to all shippers who
have used the line in the past 12 months. 49 U. S. C. § 10904 (a) (3) (D)
(1976 ed., Supp. III). See In re Chicago, M., St. P. & P. R. Co., 611
F. 2d 662, 668 (CA7 1979).

[9] Section 1 (20), which was, like § 1 (18), added by the Transportation
Act of 1920, provided that "any court of competent jurisdiction" could
enjoin a carrier's abandonment of a line when application for approval has
not been made to the Commission. The right of a private party to seek
an injunction was repealed by the Railroad Revitalization and Regulatory
Reform Act of 1976, Pub. L. 94–210, 90 Stat. 127–130. Under the Act
as amended and recodified, only the United States, the government of a
State, or the Commission itself may sue to enjoin most illegal abandon-
ments. See 49 U. S. C. §§ 11505 (action by state), 11702 (action by the
Commission), 11703 (action by the United States) (1976 ed., Supp. III).
A private person may seek injunctive relief only to prevent illegal aban-
donment of a freight-forwarding service. See 49 U. S. C. § 11704 (1976
ed., Supp. III). The fact that shippers in the position of respondent no
longer have available the remedy of injunction does not affect our decision,
because numerous other remedies for improper cessations of service still
exist. "[T]he absence of any judicial remedy [would] plac[e] the shipper
entirely at the mercy of the carrier, contrary to the overriding purpose
of the Act." Hewitt-Robins, Inc. v. Eastern Freight-Ways, Inc., 371 U. S.,
at 88 (emphasis added).

that has been approved by the Commission.[10]  The structure of the Act thus makes plain that Congress intended that an aggrieved shipper should seek relief in the first instance from the Commission.

In sum, the construction of the applicable federal law is straightforward and unambiguous.  Congress granted to the Commission plenary authority to regulate, in the interest of interstate commerce, rail carriers' cessations of service on their lines.  And at least as to abandonments, this authority is exclusive.

Equally clear are the meanings of the state statutory and common-law obligations that petitioner seeks to challenge. The Iowa Court of Appeals held that Iowa Code §§ 479.3 and 479.122 (1971) "impos[e] on the railroads the unqualified and unconditional duty to furnish car service and transportation to all persons who apply," and that this state-law duty was not pre-empted by the provisions of the Interstate Commerce Act imposing a similar duty.  295 N. W. 2d, at 469. According to respondent's complaint in the state court, petitioner's failure to carry out these "duties of a common carrier" injured it in the amount of $350,000.  App. 78.  The state court also held that respondent could maintain its causes of action for common-law negligence based on petitioner's alleged failure to maintain the roadbed and for common-law tort for purported interference with contractual relations

_____

[10] Although §§ 8 and 9, recodified at 49 U. S. C. § 11705 (1976 ed., Supp. III), provide a general right to seek damages when injured by a carrier's violation of the Act, this Court stated in *Powell* v. *United States,* 300 U. S. 276, 287 (1937), that the injunctive remedy, see n. 9, *supra,* was "the only method for enforcing" what was then § 1 (18) of the Act. Because the carrier's actions here have been approved by the Commission, there has been no violation of the Act, and this damages remedy could have no application to this case.  We therefore need not decide whether the language of *Powell* means that a damages action can *never* be brought for an illegal abandonment, or if such an action can be brought, whether Congress might have intended that state and federal courts have concurrent jurisdiction.  We thus reserve those questions for a proper case.

with respondent's customers. 295 N. W. 2d, at 471–472. The negligence count as outlined in respondent's complaint claimed $150,000 in damages based on petitioner's alleged failure "to maintain the track in a proper manner" and "to properly maintain the railroad right-of-way." App. 79–80. The tort count alleged that "at all times material hereto, it was the avowed and publicized purpose of [petitioner] to close all unproductive lines under its control," and that this plan interfered with respondent's contracts and damaged it in the amount of $100,000. *Id.*, at 81. These, then, are the claims that the Iowa Court of Appeals held properly cognizable in the state courts.

## B

Armed with these authoritative constructions of both the federal regulatory scheme and the state law, we must next determine whether they conflict. The Iowa Court of Appeals held that the two remedies for abandonment merely complemented one another. We disagree. Both the letter and the spirit of the Interstate Commerce Act are inconsistent with Iowa law as construed by that court. The decision below amounts to a holding that a State can impose sanctions upon a regulated carrier for doing that which only the Commission, acting pursuant to the will of Congress, has the power to declare unlawful or unreasonable. Cf. *Chicago* v. *Atchison, T. & S. F. R. Co.*, 357 U. S., at 87. It is true that not one of the three counts of respondent's state-court complaint mentions the word "abandonment," but compliance with the intent of Congress cannot be avoided by mere artful pleading. It is difficult to escape the conclusion that the instant litigation represents little more than an attempt by a disappointed shipper to gain from the Iowa courts the relief it was denied by the Commission.[11]

---

[11] The fact that respondent did not perfect its filing before the Commission, see n. 3, *supra*, does not affect either the validity or the finality of

Respondent's main cause of action alleges an improper failure to furnish cars on the Kalo-Fort Dodge branch line. In *Missouri Pacific R. Co.* v. *Stroud,* 267 U. S. 404 (1925), this Court confronted the precise question whether a state-court damages action would lie for a carrier's failure to furnish cars to carry a shipper's goods in interstate commerce.[12]   The Court held that because the lumber shipped by the carrier moved in interstate, rather than intrastate, commerce, "[t]he state law has no application . . . ." *Id.,* at 408.   In the instant case, the bricks that respondent here shipped in petitioner's cars, like the lumber in *Missouri Pacific,* were moving in interstate commerce.[13]   Respondent in essence seeks to use state law to compel petitioner to furnish cars in spite of the congressional decision to leave regulation of car service to the Commission.   But "[t]he duty to provide cars is not absolute," and the law " 'exacts only what is reasonable of the railroads under the existing circumstances.' "   *Milmine Grain Co.* v. *Norfolk & Western R. Co.,* 352 I. C. C. 575, 585 (1976), citing *Elgin Coal Co.* v. *Louisville & Nashville R. Co.,* 277 F. Supp. 247, 250 (ED Tenn. 1967).   See *Midland Valley R. Co.* v. *Barkley,* 276 U. S. 482, 484 (1928).   The judgment as to what constitutes reasonableness belongs exclusively to the Commission.   Cf. *Purcell* v. *United States,* 315 U. S., at 384–385.   It would vitiate the overarching congressional intent of creating "an efficient and nationally integrated railroad system," *ICC* v.

the Commission's findings with respect to the reasonableness of petitioner's actions.   These findings remain valid if supported by substantial evidence, see *Illinois Central R. Co.* v. *Norfolk & Western R. Co.,* 385 U. S. 57, 66 (1966), and in any case are not ordinarily subject to revision via collateral attack in a civil action.

[12] The Commission's authority over furnishing cars was reflected in §§ 1 (4) and 1 (11) of the Act, recodified at 49 U. S. C. §§ 11101 (a) and 11121 (a) (1976 ed., Supp. III).

[13] See n. 1, *supra.*

*Railway Labor Executives Assn.*, 315 U. S. 373, 376 (1942), to permit the State of Iowa to use the threat of damages to require a carrier to do exactly what the Commission is empowered to excuse. A system under which each State could, through its courts, impose on railroad carriers its own version of reasonable service requirements could hardly be more at odds with the uniformity contemplated by Congress in enacting the Interstate Commerce Act.

The conclusion that a suit under state law conflicts with the purposes of the Act is merely bolstered when, as here, the Commission has actually approved the abandonment. In reaching its decision, the Commission expressly found that "the cessation of service occurred because of conditions over which [petitioner] had no control." App. to Pet. for Cert. 35a. Because Congress granted the exclusive discretion to make such judgments to the Commission, there is no further role that the state court could play. Even though the approval did not come until after respondent filed its civil suit, it would be contrary to the language of the statute to permit litigation challenging the lawfulness of the carrier's actions to go forward when the Commission has expressly found them to be reasonable. See 49 U. S. C. § 1 (17)(a), recodified at 49 U. S. C. § 10501 (c) (1976 ed., Supp. III). We therefore hold that Iowa's statutory cause of action for failure to furnish cars cannot be asserted against an interstate rail carrier on the facts of this case.

The same reasoning applies to respondent's other asserted causes of action, because they, too, are essentially attempts to litigate the issues underlying petitioner's abandonment of the Kalo-Fort Dodge line. The questions respondent seeks to raise in the state court—whether roadbed maintenance was negligent or reasonable and whether petitioner abandoned its line with some tortious motive—are precisely the sorts of concerns that Congress intended the Commission to address in weighing abandonment requests from the carriers

subject to its regulation.[14]   See *Purcell* v. *United States, supra,* at 385; *Chesapeake & Ohio R. Co.* v. *United States,* 283 U. S. 35, 42 (1931).   That alone might be enough to prohibit respondent from raising them in a state court.   Cf. *Pennsylvania R. Co.* v. *Clark Bros. Coal Mining Co.,* 238 U. S. 456, 469 (1915) (no damages action may be brought for car distribution practices until Commission has ruled them unlawful).

But we need not decide whether a state-court suit is barred when the Commission is empowered to rule on the underlying issues, because here the Commission has actually addressed the matters respondent wishes to raise in state court.   The Commission's order approving the abandonment application found that after the first two landslides, petitioner "made necessary repairs to enable continuation of service," that further repairs after the 1967 slide would not have been "sufficient to insure continuous operations," that the abandonment was not "willful," that respondent has no right to "insist that a burdensome line be maintained solely for its own use," and that "continued operation of the line would be an unnecessary burden on [petitioner] and on interstate commerce."   App. to Pet. for Cert. 35a–36a.   These findings by the Commission, made pursuant to the authority delegated by Congress, simply leave no room for further litigation over the matters respondent seeks to raise in state court.   Consequently, we hold that on the facts of this case, the Interstate Commerce Act also pre-empts Iowa's common-law causes of action for damages stemming from a carrier's negligence and tort when the judgments of fact and of reasonableness necessary to the decision have already been made by the Commission.

---

[14] Most of the Commission's abandonment decisions turn in part on factors such as those respondent wishes the state court to decide. See, *e. g., Chicago & N. W. Transp. Co. Abandonment,* 354 I. C. C. 121, 125–126 (1977); *Baltimore & Annapolis R. Co. Abandonment,* 348 I. C. C. 678, 700–703 (1976); *Missouri Pacific R. Co. Abandonment,* 342 I. C. C. 643, 644 (1972).

Nothing in our decision in *Pennsylvania R. Co.* v. *Puritan Coal Mining Co.*, 237 U. S. 121 (1915), compels a contrary result. But because both respondents and the Iowa Court of Appeals rely heavily on its language, we discuss the case in some detail. In *Puritan,* this Court was called upon for the first time to interpret what was then § 22 of the Interstate Commerce Act as it related to a carrier's duty to furnish cars. That section, which survives without substantive change in the Act as recodified,[15] provided that nothing in the Act "shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies." Relying on this language, this Court held that a shipper could pursue its state common-law remedies for failure to provide cars when the carrier had previously agreed to provide them, as long as "there is no administrative question involved." *Id.,* at 131–132. Without this provision, the opinion explained, "it might have been claimed that, Congress having entered the field, the whole subject of liability of carrier to shippers in interstate commerce had been withdrawn from the jurisdiction of the state courts," so § 22 was added to make plain that the Act "was not intended to deprive the state courts of their general and concurrent jurisdiction." *Id.,* at 130. The Iowa Court of Appeals relied on this broad-sounding language in concluding that respondent's causes of action survived the enactment of and the various amendments to the Interstate Commerce Act. Respondent urges essentially the same point in this Court.

This analysis fails to take into account the fact that the Commission's exclusive jurisdiction over abandonments arises from the Transportation Act of 1920, and its authority over car service from the Esch Car Service Act, ch. 23, 40 Stat. 101. Our decision in *Puritan* preceded these amendments to the Interstate Commerce Act, so it can hardly be viewed as

---

[15] See 49 U. S. C. § 10103 (1976 ed., Supp. III).

an authoritative construction of the Act as amended.[16]   And even assuming for the sake of argument the continuing valid- ity of that opinion's reasoning, it does not control the disposi- tion of the instant case.   The Court in *Puritan* expressly noted that the matters presented to the state courts for deci- sion involved no questions of law or questions calling for an administrative judgment, and, in particular, no issue as to the reasonableness of the carrier's policies.   237 U. S., at 131– 132.   Instead, the state court was called upon to decide only the factual question whether the railroad had carried out the duties that it had agreed to undertake.   The Court's opinion in *Puritan* recognized the importance of this distinction:

> "[I]t must be borne in mind that there are two forms of discrimination,—one in the rule and the other in the manner of its enforcement; one in promulgating a dis- criminatory rule, the other in the unfair enforcement of a reasonable rule.   In a suit where the rule of practice itself is attacked as unfair or discriminatory, a question is raised which calls for the exercise of the judgment and discretion of the administrative power which has been vested by Congress in the Commission. . . .   Until that body has declared the practice to be discriminatory and unjust, no court has jurisdiction of a suit against an interstate carrier for damages occasioned by its en- forcement. . . .
>
> "But if the carrier's rule, fair on its face, has been un- equally applied, and the suit is for damages, occasioned by its violation or discriminatory enforcement, there is

---

[16] The Transportation Act of 1920, moreover, also added to the Inter- state Commerce Act a new § 1 (17)(a), recodified at 49 U. S. C. § 10501 (c) (1976 ed., Supp. III), which expressly invalidates state remedies when they are "inconsistent with an order of the Commission" or prohibited under any provision of the Act.   See *supra,* at 326.   The *Puritan* Court obviously could not have considered this provision when deciding that a shipper could in some circumstances bring a state-court action for failure to furnish cars.

no administrative question involved, the courts being called upon to decide a mere question of fact." *Ibid.*

Here, we face the reverse of the situation that gave rise to the *Puritan* case. The questions presented to the state court in the instant litigation all involve evaluations of the reasonableness of petitioner's abandonment of the branch line. These issues call for the type of administrative evaluations and conclusions that Congress has entrusted to the informed discretion of the Commission. See *Midland Valley R. Co., v. Barkley,* 276 U. S., at 484–486; *Great Northern R. Co.* v. *Merchants Elevator Co.,* 259 U. S. 285, 291 (1922). Under the *Puritan* analysis, "no court has jurisdiction" of a suit such as respondent's until the Commission "has declared the practice to be . . . unjust." 237 U. S., at 131. And the Commission, in an exercise of its discretion, has done precisely the opposite; it has decided that the abandonment was proper.[17] Respondent has chosen not to seek judicial review of the Commission's judgment through the means provided by Congress.[18] For all of these reasons, to the extent that

---

[17] The court below apparently recognized the distinction for jurisdictional purposes between state-court actions raising strictly factual claims and those calling for an exercise of administrative discretion. See 295 N. W. 2d, at 472. If it is assumed that *Puritan* remains good law, then the state court erred only in concluding that a suit such as respondent's raises only questions of fact that do not call for any expertise. Respondent itself concedes that even under its theory of the case, "the *sole issue* for determination is whether or not the service was terminated by compelling circumstances beyond the control of the carrier." Brief for Respondent 6 (emphasis in original). That is exactly the kind of question Congress intended that the Commission decide, and in the case before us, the Commission has of course already decided it.

[18] Respondent's reliance on *ICC* v. *Chicago & N. W. Transp. Co.,* 533 F. 2d 1025 (CA8 1976), is also misplaced. That case held only that a federal-court suit seeking injunctive relief on behalf of the Commission, which is among the express remedies enumerated in the Act, could go forward without awaiting the Commission's decision on a pending request for an abandonment. We express no opinion as to the merits of

the *Puritan* analysis has any application here, it supports petitioner's and the Commission's arguments that the Iowa courts lack jurisdiction to entertain respondent's suit for damages arising from petitioner's abandonment of the Kalo-Fort Dodge branch line.

Our decision today does not leave a shipper in respondent's position without a remedy if it is truly harmed. On the contrary, an aggrieved shipper is still free to pursue the avenues for relief set forth in the statute. Respondent could have gone to the Commission and challenged petitioner's refusal to provide service before any abandonment application was filed, but it did not. After petitioner filed its request for a certificate, respondent had the opportunity to present evidence to the Commission in support of its allegation, but failed to do so. Having lost its battle there, respondent could have followed the congressionally prescribed path by seeking review in the appropriate United States court of appeals. This, too, respondent failed to do. The Act creates no other express remedies for a shipper who is damaged by a carrier's abandonment of a line. In particular, nothing in the Act suggests that Congress contemplated permitting a shipper to bring a civil damages action in state court. And such a right to sue, with its implied threat of sanctions for failure to comply with what the courts of each State consider reasonable policies, is plainly contrary to the purposes of the Act. We are thus not free to assume that it has been preserved.

## IV

We hold that the Interstate Commerce Act precludes a shipper from pressing a state-court action for damages against a regulated carrier when the Interstate Commerce Commission, in approving the carrier's application for abandonment, reaches the merits of the matters the shipper seeks to raise

that case, but we do note that its facts bear little relation to those before us.

in state court. We reserve for another day the question whether such a cause of action lies when no application is made to the Commission. The judgment of the Iowa Court of Appeals is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*