THM, LTD v COMMISSIONER OF INSURANCE

Docket No. 104457. Submitted December 13, 1988, at Lansing. Decided May 1, 1989.

THM, Ltd., a wholly owned subsidiary of Detroit & Northern Savings and Loan, applied with the Bureau of Insurance for licensure as an insurance agency. Following hearings in which the Independent Insurance Agents of Michigan and several insurance agencies intervened, the Commissioner of Insurance issued a final decision denying the application. On THM's petition for review, the Genesee Circuit Court, Donald R. Freeman, J., affirmed the commissioner's decision. Petitioner appealed to the Court of Appeals.

The Court of Appeals *held:*

1. Under § 1242(3) of the Insurance Code, MCL 500.1242(3); MSA 24.11242(3), the Commissioner of Insurance, after notice and opportunity for a hearing, may refuse to grant a license if he determines by a preponderance of the evidence that it is probable that the business or primary occupation of the applicant will give rise to coercion, indirect rebating of commissions or other practices in the sale of insurance which are prohibited by law.

2. Competent, material and substantial evidence on the whole record supported the commissioner's conclusion that petitioner's and Detroit & Northern's proposed marketing plans directed at Detroit & Northern's mortgage loan customers, most of whom must insure the realty which serves as collateral for their loans, would violate § 2077(2) of the Insurance Code, MCL 500.2077(2); MSA 24.12077(2), which precludes a mortgage lender from using information relating to such insurance need to its advantage or to the detriment of the borrower.

3. The commissioner's finding, that efforts toward coercion and inducement would probably be made on Detroit & Northern customers to buy insurance through petitioner, was sup-

REFERENCES

Am Jur 2d, Administrative Law §§ 610-621; Constitutional Law §§ 291, 292; Insurance §§ 17-54.

See the Index to Annotations under Insurance and Insurance Companies.

ported by competent, material and substantial evidence on the whole record.

4. Competent, material and substantial evidence on the whole record supported the commissioner's finding that licensure of petitioner would lead to violations of § 1207(3) of the Insurance Code, MCL 500.1207(3); MSA 24.11207(3), which provides that an insurance agent shall not reward or remunerate any person for procuring or inducing business, furnishing leads or prospects, or acting in any other manner as an agent, and violations of § 2017 of the Insurance Code, MCL 500.2017; MSA 24.12017, regarding unfair methods of competition and unfair and deceptive acts or practices in the business of insurance.

5. State licensure and regulation of an insurance business, such as petitioner, which is owned by a federally chartered savings and loan association, such as D&N, are not preempted by federal laws and regulations relating to savings and loan associations.

Affirmed.

SHEPHERD, P.J., concurred in the result and agreed with the analysis of § 2077(2) of the Insurance Code.

1. ADMINISTRATIVE LAW — AGENCY DECISIONS — APPEAL.

An administrative decision reached after a hearing held pursuant to the Administrative Procedures Act is to be upheld on judicial review if it is supported by competent, material and substantial evidence on the whole record; the decision must be upheld if it is supported by such evidence as a reasonable mind would accept as adequate to support the decision; strict deference must be given to the agency's findings of fact; the Court of Appeals will reverse the agency's decision where the decision is not authorized by law or amounts to arbitrary action (Const 1963, art 6, § 28; MCL 24.306[1][d]; MSA 3.560[206][1][d]).

2. LICENSES — INSURANCE AGENCIES — COMMISSIONER OF INSURANCE.

The Commissioner of Insurance, after notice and opportunity for a hearing, may refuse to grant an application for licensure as an insurance agency if he determines by a preponderance of the evidence that it is probable that the business or primary occupation of the applicant will give rise to coercion, indirect rebating of commissions or other practices in the sale of insurance which are prohibited by law (MCL 500.1242[3]; MSA 24.11242[3]).

3. CONSTITUTIONAL LAW — SUPREMACY CLAUSE — PREEMPTION.

Federal preemption of state law requires clear congressional intent; such intent may be established by a showing that it was

Congress' purpose to dominate a particular field; there is a strong presumption against preemption in areas traditionally occupied by the states (US Const, art VI).

4. ADMINISTRATIVE LAW — LICENSURE AND REGULATION OF INSURANCE AGENCIES — SAVINGS AND LOAN ASSOCIATIONS.

   Licensure and regulation by the State of Michigan of an insurance business wholly owned by a federally chartered savings and loan association are not preempted by federal laws and regulations relating to savings and loan associations (12 USC 1464; 12 CFR 545.74).

*Miller, Canfield, Paddock & Stone* (by *John D. Pirich, Steven D. Weyhing* and *Noah Eliezer Yanich*), for THM, Ltd.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Harry G. Iwasko, Jr.,* and *E. John Blanchard,* Assistant Attorneys General, for Commissioner of Insurance.

*Zagaroli, Clark & Colpean, P.C.* (by *Michael A. Zagaroli, Suzanne Krumholz Clark* and *John C. Colpean*), for intervenors.

Before: SHEPHERD, P.J., and MURPHY and T. GILLESPIE,* JJ.

MURPHY, J. Petitioner appeals as of right from an order of the circuit court which affirmed the June, 1985, decision of the Commissioner of Insurance denying petitioner's application for licensure as an insurance agency.

Petitioner, THM, Ltd., is a wholly owned subsidiary of Detroit & Northern Savings and Loan, a federally chartered savings and loan association. In October, 1983, petitioner applied to the Michigan Insurance Bureau to be licensed as an insurance agency. Ninety-nine percent of D&N's loan

---

* Circuit judge, sitting on the Court of Appeals by assignment.

portfolio consists of real estate mortgages. Eighty-five percent of these mortgages are on one-to-four family dwellings, and fourteen percent are commercial real estate loans. D&N requires insurance on the collateral for its real estate loans and it currently offers credit insurance in conjunction with its new installment loan program. D&N wanted to enter the insurance business in order to offer more services to its customers and to increase its profits. D&N's goal is to enable its customers to obtain their loans and their insurance through D&N.

The insurance bureau staff challenged petitioner's application claiming that several violations of the Michigan Insurance Code would occur if petitioner became licensed and conducted business according to its announced plan. MCL 500.1242(3); MSA 24.11242(3) sets forth the standards upon which the Insurance Commissioner can refuse to grant a license. It provides:

> After notice and opportunity for a hearing, the commissioner may refuse to grant or renew a license to act as an agent, solicitor, adjuster or insurance counselor if he determines by a preponderance of the evidence, that it is probable that the business or primary occupation of the applicant will give rise to coercion, indirect rebating of commissions or other practices in the sale of insurance which are prohibited by law.

The Independent Insurance Agents of Michigan and other insurance agencies intervened in opposition to petitioner's licensure. Throughout 1984, the parties were involved in extensive discovery and procedural motions, including a motion by petitioner for summary judgment. A referee denied petitioner's motion following a lengthy hearing. In January, 1985, a hearing was held before hearing

referee Edward F. Rodgers. Following the hearing, both sides presented posthearing briefs and responses. On April 5, 1985, the referee issued a proposal for decision. Petitioner, the insurance bureau staff, and the intervenors filed exceptions to the proposal.

On June 10, 1985, the Insurance Commissioner issued a final decision denying petitioner's application for licensure as an insurance agent pursuant to MCL 500.1242(3); MSA 24.11242(3). The commissioner determined that, if the license was granted, it would probably give rise to coercion in violation of three sections of the Insurance Code. In October, 1987, the circuit court affirmed the Insurance Commissioner's decision. Petitioner now appeals as of right.

Petitioner first contends that the commissioner's finding that petitioner's plan to send mailings to its customers would probably give rise to violations of MCL 500.2077(2); MSA 24.12077(2) was unsupported by competent, material and substantial evidence. We disagree.

An administrative decision, following a hearing held pursuant to the provisions of the Michigan Administrative Procedures Act, MCL 24.306; MSA 3.560(206), is to be upheld if it is supported by competent, material and substantial evidence on the whole record. Const 1963, art 6, § 28; MCL 24.306(1)(d); MSA 3.560(206)(1)(d); *Auto Club Ins Ass'n v Comm'r of Ins,* 144 Mich App 525, 529-530; 376 NW2d 150 (1985). Under this standard, the agency's decision must be upheld if it is supported by such evidence as a reasonable mind would accept as adequate to support the decision. *Kieffer v Dep't of Licensing & Regulation,* 169 Mich App 312, 315; 425 NW2d 539 (1988). Strict deference must be given to an administrative agency's findings of fact. *Michigan Ed Ass'n v North Dearborn*

*Heights School Dist,* 169 Mich App 39, 46; 425 NW2d 503 (1988); *Kieffer, supra,* p 315. This Court will reverse only if the decision of the commissioner is not authorized by law or amounts to arbitrary action. *Kieffer, supra,* p 315.

In this case, the Insurance Commissioner found that § 2077(2) of the Insurance Code would be violated if D&N carried out its plan to send general mailings to its customers informing them of petitioner's existence and that petitioner sells insurance.

Section 2077(2), MCL 500.2077(2); MSA 24.12077(2), provides:

> If an instrument requires that a purchaser, mortgagor or borrower furnish insurance of any kind on real property being conveyed or which is collateral security to a loan, the vendor, mortgagee or lender shall refrain from using or disclosing any such information to his own advantage or to the detriment of the purchaser, mortgagor, borrower, insurance company or agency complying with such requirement.

The Insurance Commissioner stated that this section prohibits a lender from using a real estate borrower's insurance data to compete with other insurance agencies, or to make a profit at the expense of the borrower. The insurance information about a borrower available to petitioner included such items as the information that identified the borrower, the location of the insured property, construction type, size, market value, current coverage, and the expiration date of current coverage. In her findings of fact, the Insurance Commissioner found that insurance information about D&N real estate borrowers protected by § 2077(2) would be made available to petitioner or for petitioner's benefit for insurance prospecting

and that § 2077(2) would probably be violated if petitioner was licensed.

The commissioner based her findings on the marketing strategy that petitioner and D&N announced that they would pursue in their effort to enhance the penetration of D&N's customer base. The commissioner found that petitioner and D&N's marketing strategy relied heavily on "piggyback mailing," which is the use of D&N's mailing list to distribute advertisements for petitioner. The commissioner found that piggyback mailing was the functional equivalent of a physical transfer of borrowers' insurance data to petitioner. The more accurately the mailings were targeted, the more "inside information" would be put at petitioner's disposal.

The commissioner cited the deposition testimony of Ronald Hartman, vice-president of the insurance agency purchased by petitioner, that most replacement insurance is sold on the expiration date of an existing policy. The commissioner found that insurance agents accordingly want access to information about expiration dates and that D&N could supply that specific information. The commissioner also cited Hartman's proposed marketing strategy for the solicitation of D&N customers which relied heavily upon exploitation of information about expiration dates of policies held by D&N customers. The marketing strategy included direct-mail solicitation, telephone solicitation, mailing pieces in D&N outgoing mail and establishing an expiration-date system.

Petitioner argued below that D&N would not use illegal information and that it would use only names and addresses of D&N customers. Petitioner claimed that insurance information about borrowers would be collected from public records. However, the commissioner found that serious ques-

tions emerged due to the marketing strategy that relied heavily on piggyback mailings. The commissioner found that information about who is a D&N customer is not available from the public record and that such information is proprietary. Therefore, D&N's piggyback mailing was the functional equivalent of a physical transfer to petitioner of the borrower's insurance data. Moreover, the commissioner found that D&N mailings to its customers could be targeted to the narrow group of real estate borrowers whose mortgages were approaching their anniversary date. This could enable D&N to send its solicitation out together with its annual mailing of mortgage payment books. The conclusion from the commissioner's findings was that insurance information about D&N real estate borrowers protected by § 2077(2) would be available to petitioner in violation of that section.

The trial court determined that the commissioner's decision on this issue was substantiated by the evidence on the whole record. It agreed that it was D&N's strategy to rely heavily on the piggyback mailings. Based on D&N's sizable mailing system, and due to its sizable and widespread marketing, that strategy would give preference to D&N over other Michigan savings and loan institutions, and would be disadvantageous to other insurance competitors.

Section 2077(2) is clear in that a lender is not to benefit from its knowledge that a borrower must have insurance on the real property which is collateral for the loan. Based upon our review of the record in this case a reasonable mind could accept that adequate evidence was presented to support the commissioner's decision that D&N's plan to send mailings to its customers would violate § 2077(2). *Dep't of Licensing & Regulation, supra.*

Petitioner next contends that the commissioner's finding that licensure of petitioner would probably give rise to coercion of D&N's customers is unsupported by the record.

The Insurance Commissioner found that efforts toward coercion and inducement would probably be made on D&N customers to buy insurance through petitioner. The commissioner defined coercion and inducement as the use of D&N's market power in the lending sector to sell a product in the insurance sector. The commissioner found that D&N had incentives to coerce and induce customers to deal with petitioner, since petitioner is a wholly owned subsidiary of D&N and D&N would be intensely interested in enhancing petitioner's penetration of D&N's customer base. The commissioner also found that lenders have significant leverage over people who are seeking credit, and that it was possible that D&N would make efforts to coerce and induce its customers to deal with petitioner. Moreover, the commissioner stated that it was not clear how D&N would conduct loan negotiations because its plans had changed in the course of the hearing. The commissioner found that there would be no adequate regulatory controls that could minimize the coercion and inducement directed at D&N customers with respect to the conduct of loan negotiations. The commissioner concluded that a significant amount of coercion and inducement takes place nationwide although such activity is illegal.

In arriving at her findings, the commissioner considered the testimony of Emmett Vaughn, an insurance economist who testified for the insurance bureau staff and intervenors. The commissioner cited Vaughn's deposition testimony in regard to the existence of strong incentives of loan competitors to use whatever techniques are available to compete and increase profits of parent

companies. The commissioner also cited Vaughn's statements that, when a lender puts pressure on loan applicants to buy insurance from its affiliate, the applicants are not likely to complain, fearing that a complaint would jeopardize their access to credit.

The commissioner noted that the testimony of Benjamin Neff, petitioner's insurance expert, that savings and loan associations are generally honorable institutions who bend over backwards to comply with regulations and rules or statutes, was not persuasive. She stated that it was possible that D&N, when faced with strong incentives, could be led to do dishonorable things and cited D&N's shifting policies regarding the role of loan officers during negotiations with prospective buyers.

The trial court determined that there was competent, material and substantial evidence on the whole record that coercion would be present if petitioner was granted licensure. The court specifically cited a statement of Emmett Vaughn:

> I think with respect to consumers it creates conditions in which their range of choices could be narrowed either explicitly or in their own minds.

The court also cited Vaughn's discussion of the efforts made in other states to try to alleviate such conditions even when borrowers signed forms indicating that they knew they were not required to purchase any insurance:

> There are dozens of ways that we have tried to sanitize the transaction. None of them seem to have worked.
> I think that the voluntary tie-in, of course, is structural. It is inherent in the combination of the sale of any product and the extension of credit. People think that they will enhance the likelihood

that they are going to get the credit by buying this other product.

The trial court also cited the testimony of Jean Carlson, the acting deputy commissioner of insurance. Carlson stated:

> We were concerned about the potential for coercion which is inherent in a financial institution's relationship with an application for a loan for a continuing customer who needs to go to that institution for occasional increases or refinancing or cyclical type of refinancing arrangement, or even for individuals who have got a loan but then, because of escrow reasons or other reasons, may find themselves having to continue their relationship with the financial institutions about their insurance needs.

The trial court stated that it was clearly in D&N's interest to have petitioner benefit by selling insurance. The court noted Wayne Knecht's testimony that D&N was petitioner's sole owner and therefore had an interest in petitioner's success. The trial court concluded that the commissioner's determination relative to coercion was properly supported by the record.

Based upon our thorough review of the record relative to this issue, we believe that there was competent, material and substantial evidence on the whole record to support the commissioner's findings.

Petitioner next contends that the commissioner improperly interpreted § 1207(3) and § 2017 of the Insurance Code. We disagree.

Section 1207(3), MCL 500.1207(3); MSA 24.11207(3), provides:

> Except as provided in sections 1212 and 1860

and subsection (4) an agent shall not reward or remunerate any person for procuring or inducing business in this state, furnishing leads or prospects, or acting in any other manner as an agent.

Section 2017, MCL 500.2017; MSA 24.12017, provides:

The following are defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance:

Issuing or delivering or permitting agents, officers, or employees to issue or deliver, agency company stock or other capital stock, or benefit certificates or shares in any common law corporation, or securities or any special or advisory board contracts or other contracts of any kind promising returns and profits as an inducement to insurance.

This Court in *Lawyers Title Ins Corp v Chicago Title Ins Co,* 161 Mich App 183, 192; 409 NW2d 774 (1987), specifically addressed the application of § 1207(3). In that case, real estate brokers sought alternative means of benefitting from real estate referrals which they controlled. Many of the brokers established their own title insurance companies to which they referred their real estate customers. As shareholders in these companies, the brokers received dividends based on the companies' profits, which were directly derived from the referrals of the brokers.

Lawyers Title Insurance Company recognized the possible financial benefits and entered into agreements with the real estate brokers who became the exclusive agents of Lawyers Title. Lawyers Title conducted the title searches and issued title insurance policies to the brokers' title insurance companies. In turn, when Lawyers Title earned profits, it paid substantial dividends to the

shareholders, who were the real estate brokers who had referred the business.

The Insurance Commissioner in that case held that § 1207(3) would be violated when the licensed title agencies were rewarding and remunerating the shareholder-owner-broker based upon the number of shares owned by each broker, for the owner-broker's referral of his title insurance business. This Court agreed.

The facts of that case are similar to this case. D&N is the sole shareholder of petitioner. D&N would profit from petitioner's success because D&N has the capacity to steer its borrowers to petitioner. Similar to the real estate brokers in *Lawyers Title, supra,* who received dividends for referring their insurance business, D&N would benefit from referring its customers to petitioner.

Petitioner argues that *Lawyers Title* is distinguishable from this case because interpretation of § 1207(3) in *Lawyers Title* only applied when dividends were based on the amount of business referred by the parent to the subsidiary. Petitioner claims that there is no evidence showing that the amount of dividends which will be paid by petitioner to D&N would be dependent upon the amount of business D&N refers to petitioner. Even if this is so, this Court in *Lawyers Title, supra,* p 194, stated that it was irrelevant under § 1207(3) whether the brokers received dividends in direct proportion to their referrals. Rather, the important facts were that the brokers were receiving dividends from respondents for procuring title insurance business and that they were receiving these dividends for the amount of title insurance business they were expected to refer.

We conclude that in this case the Insurance Commissioner properly determined that it was probable that petitioner would violate § 1207(3).

Wayne Knecht testified that D&N would profit regardless of whether dividends were paid. It is obvious to us that, if the license is granted to petitioner, the more business petitioner has, the more profit D&N would make regardless of whether any dividends are ever paid. Therefore, the commissioner's finding that § 1207(3) would probably be violated if petitioner is licensed was supported by competent, material and substantial evidence.

Finally, petitioner contends that the Federal Home Loan Bank Board, pursuant to authority granted by Congress, has determined that it is appropriate for federal savings and loan associations to own insurance agencies. Therefore, the commissioner's decision must be set aside. Petitioner contends that the commissioner's position frustrates the federal regulatory scheme imposed by Congress and is in violation of the Supremacy Clause of the United States Constitution. We disagree.

MCL 24.306(1)(a); MSA 3.560(206)(1)(a) provides that a decision or order of an agency may be set aside on the ground that it violates the constitution or a statute. In this case, petitioner claims that the Insurance Commissioner's decision violates the Supremacy Clause of the United States Constitution.

The doctrine of federal preemption arises from the Supremacy Clause of the United States Constitution, art VI. The United States Supreme Court has consistently held since *McCulloch v Maryland,* 12 US 316; 4 L Ed 314 (1819), that federal preemption of state law requires a clear congressional intent. Congressional intent to preempt can be found if it can be shown that it was Congress' purpose to dominate a particular field. *Rice v Santa Fe Elevator Corp,* 331 US 218, 230; 67 S Ct 1146; 91 L Ed 1447 (1947). There is always a

presumption against preemption. *Chicago & North Western Transportation Co v Kalo Brick & Tile Co,* 450 US 311, 317; 101 S Ct 1124; 67 L Ed 2d 258 (1981). The presumption against preemption is particularly strong if it is an area that is traditionally occupied by the state. *Jones v The Rath Packing Co,* 430 US 519, 525; 97 S Ct 1305; 51 L Ed 2d 604 (1977). In addition, there must be an unambiguous congressional mandate to preempt. *Florida Lime & Avocado Growers, Inc v Paul,* 373 US 132, 147; 83 S Ct 1210; 10 L Ed 2d 248 (1963). See also *People v Massey,* 137 Mich App 480, 486-487; 358 NW2d 615 (1984), lv den 422 Mich 930 (1985).

In this case, petitioner claims that the Insurance Commissioner hindered the operation of a program explicitly authorized and encouraged by federal regulation and that precluding D&N's ownership of petitioner insurance company clearly creates an obstacle to D&N's operations which is in direct conflict with and frustrates the regulatory scheme.

D&N is a federal association, chartered by, and operating under, the rules and regulations of the Federal Home Loan Bank Board. Petitioner cites the Homeowners Loan Act, 12 USC 1464, and 12 CFR 545.74 as the federal grant of authority for savings and loan service corporations to engage in insurance agency activities, and to preempt state decisions as to licensure and regulation. There is authority for federal savings and loan association service corporations to engage in insurance agency activities. 12 CFR 545.74(c)(5)(ii). However, the right of states to regulate the insurance business is specifically recognized. 12 CFR 555.17(c) provides:

Insurance Agencies—usurpation of Corporate Opportunity

* * *

(c) Exceptions. No corporate opportunity for a Federal association to enter the insurance business is deemed to have existed.

\* \* \*

(iii) While a specific State statute or regulation precluded Federal association service corporations (or their wholly-owned subsidiaries) from engaging in the insurance business;

(iv) While State licensing or regulatory authorities whose prior approval is required to engage in the insurance business followed an established and well-known policy of refusing to accept or process applications from Federal association service corporations (or their wholly-owned subsidiaries) for permission to engage in the insurance business (an association need not demonstrate existence of such a policy by instituting legal proceedings to compel approval).

Although the regulation granted permissive authority for savings and loan associations to engage in insurance activities, such activities were intended to be subject to state licensure and regulation. Therefore, there is no federal preemption because the scheme of federal regulation is not so pervasive as to lead to a reasonable inference that Congress left no room for the states to supplement it.

The United States Supreme Court in *Fidelity Federal Savings & Loan Ass'n v De la Cuesta,* 458 US 141; 102 S Ct 3014; 73 L Ed 2d 664 (1982), examined the preemption issues in relation to the Homeowners Loan Act and the Federal Home Loan Bank Board regulations. The Supreme Court overturned the California Court of Appeals ruling that the State of California could restrict the use of due-on-sale clauses in mortgage contracts issued by a federal savings and loan association. However, the Court recognized that there were limits to the Federal Home Loan Bank Board's power to

promulgate regulations. *Id.,* p 167. The Court also recognized that the broad language of 15 USC 1464(a), the statute that petitioner relies on, related to the board's authority to regulate the operation of federal savings and loans, directing itself to the lending practices of federal savings and loans.

In *De la Cuesta,* the terms of the loan instruments, including due-on-sale clauses, fell within such operations and therefore caused federal preemption of the California state law. *Id.,* pp 161, 167. *De la Cuesta* makes it clear that federal preemption under the Homeowners Loan Act and Federal Home Loan Bank Board regulations requires a finding that the regulated activity directly relates to mortgage lending practices. *Id.,* p 174. In this case, the Commissioner of Insurance was not concerned with petitioner's mortgage lending practices. The commissioner's decision was based on the evidence of petitioner's planned marketing strategies and policies. The commissioner took great care in pointing out the reasons why petitioner would be denied licensure. The commissioner stated that it was petitioner's inadequate security against possible violations of the Insurance Code that led to her decision and, if petitioner had adequate controls, her conclusion may be different. The commissioner explicitly stated that the decision to deny petitioner licensure was based on the way petitioner planned to do business and not because of its status as a lender subsidiary.

Therefore, the commissioner's ruling was supported by competent, material and substantial evidence on the whole record. It was within the commissioner's authority to deny petitioner licensure and her decision was not preempted by any federal statute or regulation.

Affirmed.

SHEPHERD, P.J., concurred in the result since he agreed with the analysis of MCL 500.2077(2); MSA 24.12077(2).