776 F.2d 355
 249 U.S.App.D.C. 389
 ILLINOIS COMMERCE COMMISSION and Patrick W. Simmons, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
International Minerals and Chemical Corporation, Association
of American Railroads, Intervenors.
 No. 84-1034.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 19, 1984.
Decided Nov. 12, 1985.
 
 Petition for Review of an Order of the Interstate Commerce commission.
 Thomas F. McFarland, Jr., Chicago, Ill., for petitioners and for intervenor Internl. Minerals & Chemical Corp. James E. Weging and Gordon P. MacDougall, Washington, D.C., were on brief for petitioners.
 Edward J. O'Meara, Atty., I.C.C., Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., John Broadley, Gen. Counsel, I.C.C., Henri F. Rush, Associate Gen. Counsel, I.C.C., John J. Powers, III, and John P. Fonte, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondents.
 James I. Collier, Jr., Washington, D.C., with whom Kenneth P. Kolson, Washington, D.C., was on brief, for intervenor Ass'n of American Railroads.
 Before WRIGHT, TAMM* and SCALIA, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SCALIA.
 SCALIA, Circuit Judge.
 
 
 1
 This is a challenge to Interstate Commerce Commission regulations specifying how the agency will calculate the costs, revenues and return on value associated with the provision of rail service, for purposes of determining whether requested abandonment of that service is in the public interest and whether the amount of subsidy offered by persons seeking to prevent abandonment is adequate. The case presents several procedural points that are relatively fact-bound and, of more general importance, requires us to consider the substantive validity of the following provisions: that all labor costs on the line sought to be abandoned are avoidable costs (i.e., costs which abandonment would eliminate); that state property taxes are avoidable costs to the extent they would eventually cease after abandonment; that track rehabilitation costs are avoidable costs to the extent they are needed not merely to comply with federal safety standards but to permit "efficient operations"; and that equipment may be valued on the basis of depreciated replacement cost rather than used market value. Involved in our consideration of some of these provisions is the question whether the same manner of calculating avoidable costs must be used for both abandonment and subsidy determinations.
 
 
 2
 * The rules in question, amendments to the Commission's earlier rules on the subject, originated with a Notice of Proposed Rulemaking in October 1982, 47 Fed.Reg. 43,747 (1982), and were finally promulgated in December 1983, 48 Fed.Reg. 54,235 (1983) (regulations codified at scattered sections of 49 C.F.R. Secs. 1152.1-.37 (1984); Commission opinion, Revision of Abandonment Regulations, printed at 367 I.C.C. 831 (1983)). Petitioners, the Illinois Commerce Commission and Patrick W. Simmons (Illinois Legislative Director of the United Transportation Union), and intervening petitioner International Minerals & Chemical Corporation, seek review under 28 U.S.C. Secs. 2321(a), 2342(5), 2344 (1982).
 
 
 3
 Under the Interstate Commerce Act, Subtitle IV, Pub.L. No. 95-473, 92 Stat. 1337 (1978) (codified as amended at 49 U.S.C. Secs. 10101-11917 (1982)), the ICC has authority to permit a railroad subject to its jurisdiction to abandon part of its lines. 49 U.S.C. Sec. 10903. However, any party interested in ensuring continued transportation over the line may prevent abandonment by offering the railroad an annual subsidy. 49 U.S.C. Sec. 10905. The subsidy criteria are quite specific: If the ICC finds that the offered annual subsidy is likely to equal the "difference between the revenues attributable to that part of the railroad line and the avoidable cost of providing rail freight transportation on the line, plus a reasonable return on the value of the line," the ICC must postpone authorization of the abandonment to permit the offeror and the railroad to enter into an agreement providing for continued transportation. 49 U.S.C. Sec. 10905(d). If the parties cannot reach agreement, either may ask the ICC to determine the subsidy amount; the ICC must determine the amount "based on the avoidable cost of providing continued rail transportation, plus a reasonable return on the value of the line...." 49 U.S.C. Sec. 10905(f)(1)(B), (e). For purposes of the foregoing provisions, "avoidable cost" is defined to mean:
 
 
 4
 all expenses that would be incurred by a rail carrier in providing transportation that would not be incurred if the railroad line over which the transportation was provided were abandoned or if the transportation were discontinued. Expenses include cash inflows foregone and cash outflows incurred by the rail carrier as a result of not abandoning or discontinuing the transportation. Cash inflows foregone and cash outflows incurred include--
 
 
 5
 (A) working capital and required capital expenditure;
 
 
 6
 (B) expenditures to eliminate deferred maintenance;
 
 
 7
 (C) the current cost of freight cars, locomotives, and other equipment; and
 
 
 8
 (D) the foregone tax benefits from not retiring properties from rail service and other effects of applicable Federal and State income taxes.
 
 
 9
 49 U.S.C. Sec. 10905(a)(1). "Reasonable return" is defined to mean, "if a rail carrier is not in reorganization, the cost of capital to the rail carrier, as determined by the Interstate Commerce Commission...." 49 U.S.C. Sec. 10905(a)(2)(A).
 
 
 10
 In contrast to these detailed statutory provisions regarding the subsidy that can prevent an otherwise permissible abandonment, the provisions applicable to the abandonment determination itself are skeletal. Abandonment must be allowed (absent subsidy) "if the Commission finds that the present or future public convenience and necessity require or permit the abandonment...." 49 U.S.C. Sec. 10903(a). This generalized standard has been interpreted to require the ICC "to exercise its discretion in balancing the burden to the railroad of providing the service against the benefits accruing to the public from the service." Black v. ICC, 737 F.2d 643, 650 (7th Cir.1984). "Once the Commission has struck that balance, its conclusion is entitled to considerable deference." Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 321, 101 S.Ct. 1124, 1132, 67 L.Ed.2d 258 (1981). The amended regulations under challenge here add some detail to the sparse statutory standard, specifying the manner in which the Commission will calculate the factors it considers in determining whether continued operations will burden a railroad, including the revenues, see 49 C.F.R. Sec. 1152.31, and the "avoidable costs," see 49 C.F.R. Secs. 1152.32-.33, attributable to continued operation.
 
 II
 
 11
 Petitioners challenge six aspects of the amended regulations. We assess each in turn.
 
 Labor Costs
 
 12
 The regulations provide that, in both subsidy and abandonment determinations, labor costs shall be treated as avoidable costs "notwithstanding any obligation of applicant [the railroad] to provide employee protection for employees after the abandonment." 49 C.F.R. Sec. 1152.32(q)(2). We agree with petitioners that this is simply inconsistent with the statutory language of Sec. 10905(a)(1), which defines "avoidable cost" as including "cash outflows incurred by the rail carrier as a result of not abandoning or discontinuing the transportation." For purposes of the statutorily required "annual subsidy," Sec. 10905(b)(1), those outflows, which may change from year to year, must be calculated on an annual basis--as the Commission's regulations themselves acknowledge, see 49 C.F.R. Sec. 1152.37. When cash payments to the employees working on the relevant line would have to continue in the year after the hypothetical abandonment, the abandonment would produce, in that year, simply no reduction of "cash outflow" and thus no "avoidable cost" is attributable to the continuation of the transportation that year. We see no way to avoid this straightforward meaning of the statutory language, which also accords with the evident statutory purpose of requiring the subsidizing party to do no more than make the railroad whole.
 
 
 13
 The present challenge, however, relates to the treatment of labor costs (and some of the other elements to be discussed below) not only for purposes of the Sec. 10905 subsidy determination, but also for purposes of the Sec. 10903 abandonment determination. (As noted earlier, the regulations as a whole apply to both, and only a few elements, such as rail rehabilitation costs, see 49 C.F.R. Sec. 1152.32(m), are accorded differing treatment in the two contexts.) Although the arguments of the parties have made no distinction between the two, we think a fundamental distinction exists. While the Commission's regulations use the term "avoidable cost," 49 C.F.R. Secs. 1152.32-.33, it is only the statutory section governing subsidy that requires this concept (itself contained within that section) to include annual "cash outflow" in the sense just discussed. Thus, it is unlawful for the Commission to apply the term "avoidable cost" in its regulations to labor costs in the manner it has for purposes of the subsidy determination, but not necessarily for purposes of the abandonment determination. In the latter context we think the Commission's interpretation not only statutorily permissible but perhaps statutorily required. For while the subsidy determination, being an annual one, necessarily focuses upon currently avoidable costs, the statutory provision governing abandonment establishes, significantly, a standard of "present or future public convenience and necessity," 49 U.S.C. Sec. 10903(a) (emphasis added). The costs that must be taken into account for purposes of evaluating the burden on the railroad are not only those costs that can be avoided at once (the year after abandonment), but also those that will be saved (so to speak) down the line. Thus, while it is perfectly sensible, as well as in accord with the statute, to excuse the subsidizing party from paying, in the first year after the line's hypothetical abandonment, labor costs that would have been incurred that year even if abandonment had occurred; it is preposterous to think that a line must be kept perpetually in service (without subsidy) simply because the millions of dollars in savings will accrue only in the second or third or fifth year after abandonment. The standard of "present or future public convenience and necessity" serves to avoid just such an absurdity. It may be that some costs (e.g., a newly concluded 99-year lease for the right of way) will terminate so far in the future that it is unrealistic to assume that the current balance of benefits and burdens will exist at that distant time, and unreasonable to impair the immediate public interest for benefits so remote. But the likelihood of any labor costs falling within this category seems to us so scant (if not nonexistent) that the Commission could appropriately treat them as generically "avoidable" for the abandonment determination--though not, as we have said, for purposes of calculating the required subsidy. General rules need not work perfectly in all their applications; or to put it more precisely, overall perfection is not best pursued by requiring the delay and expense of case-by-case determination when generic treatment would almost invariably produce the same result. Since all labor costs terminable within a reasonable period may be taken into account for purposes of the abandonment determination; since those terminable only in the distant future are self-evidently rare (one is driven to posit the lifetime employment contract with an 18-year-old worker who can only be used on the abandoned line); and since those that are in addition significant enough to alter an abandonment determination are rarer still, if not entirely nonexistent; the Commission's rule is valid. If and when an exception significant enough to distort the abandonment determination is brought to the Commission's attention, there will be time enough to consider whether it would be arbitrary or capricious to refuse a variance. Cf. KCST-TV v. FCC, 699 F.2d 1185, 1200-01 (D.C.Cir.1983) (Scalia, J., dissenting).
 
 
 14
 Petitioners assert that this analysis is inconsistent with the interpretation of "avoidable cost" for abandonment purposes adopted in City of Cherokee v. ICC, 641 F.2d 1220, 1228-29 (8th Cir.1981) ("Cherokee I "), which held that the ICC could not treat as avoidable labor costs that would have to be paid "indefinitely ... regardless of whether the ... line were abandoned." Id. at 1228 (footnote omitted). We think not. Cherokee I involved the Commission's allowance of labor costs--without inquiry into when they would terminate--in an abandonment adjudication. The action appealed from did not clearly represent, as the present rule does, a generalized determination by the Commission, after due consideration, that all labor costs "are ultimately avoidable," Revision of Abandonment Regulations, 367 I.C.C. at 836. It was thus quite correct, and in no way inconsistent with our present opinion, to remand the matter for the finding which the Commission had neglected, whether the particular costs there involved were avoidable. It would be a different matter if Cherokee I had set aside the abandonment determination because labor costs significant enough to affect the outcome were in fact not avoidable; that would cast doubt upon the validity of the general proposition of avoidability that we here sustain. Not only was that not the holding of Cherokee I but, upon subsequent appeal of the Commission's decision on remand, the Eighth Circuit held that the labor costs either were properly found to be avoidable or were without consequence to the determination. City of Cherokee v. ICC, 727 F.2d 748, 753 (8th Cir.1984). (The only other cases we are aware of dealing with this issue have likewise found the labor costs in question to be either avoidable, see International Minerals & Chemical Corp. v. ICC, 656 F.2d 251, 255-56 (7th Cir.1981), or inconsequential to the outcome, see Illinois v. ICC, 722 F.2d 1341, 1346 (7th Cir.1983).) We also note that it was assumed without discussion (and apparently without argument) in Cherokee I, as it is not assumed here, that the avoidable costs applicable to abandonment and those applicable to subsidy are one and the same. See 641 F.2d at 1228-29 (applying to abandonment analysis Sec. 10905 definition of "avoidable cost").
 
 
 15
 If the Commission were plainly operating under the misconception that the law requires the same definition of "avoidable cost" for both the subsidy and the abandonment determinations, or were applying a policy judgment that the same definition should be used for both purposes, it might be argued that the two portions of the rule are not severable and that the rule cannot be affirmed as to either application. See, e.g., North Carolina v. FERC, 730 F.2d 790, 795-96 (D.C.Cir.1984). Neither of those conditions exists, since in several respects the regulations provide for differing definitions. See 49 C.F.R. Sec. 1152.32(m), (p). We therefore vacate and remand for further consideration that portion of the regulation applicable to labor costs in subsidy determinations and uphold the portion applicable to labor costs in abandonment determinations.
 
 Property Taxes
 
 16
 The amended regulations provide that railroads may treat the pro rata share of their state property tax liability attributable to the line to be abandoned or subsidized as an avoidable cost even where taxes are not levied on an ad valorem basis. 49 C.F.R. Sec. 1152.32(j)(3). Although this might be interpreted as dispensing with the requirement for a causal connection between the tax and ownership of the abandoned property, the accompanying opinion makes clear that the railroad must demonstrate "that the tax liability will eventually cease" due to the disposition of property. Revision of Abandonment Regulations, 367 I.C.C. at 837. In its essential elements, therefore, petitioners' challenge to this portion of the regulation is a repeat of their challenge to the treatment of labor costs. Since we think tax liability no more likely than labor costs to terminate only in the distant future, our disposition is similarly unchanged: We vacate and remand the regulation insofar as it governs subsidy calculations and uphold it insofar as applied to abandonment.
 
 Track Rehabilitation Costs
 
 17
 The amended regulations permit railroads in abandonment proceedings to include the cost of rehabilitating track to the extent necessary for "efficient operations over the line segment." 49 C.F.R. Sec. 1152.32(m)(1). The previous regulations had allowed costs for rehabilitating track only to the extent necessary to meet minimum federal safety standards. See 49 C.F.R. Sec. 1121.42(m)(1) (1981). The text of the amendment was published in the appendix to the Notice of Proposed Rulemaking, 47 Fed.Reg. at 43,754, thereby satisfying the Administrative Procedure Act ("APA") requirement that "the terms or substance of the proposed rule or a description of the subjects and issues involved" be published in the Federal Register. 5 U.S.C. Sec. 553(b)(3) (1982). Petitioners claim, however, that the Commission's failure to discuss the amendment in the body of the notice violated the judicial gloss on the APA requirement: notice must "afford[ ] interested parties a reasonable opportunity to participate in the rulemaking process." South Carolina ex rel. Tindal v. Block, 717 F.2d 874, 885 (4th Cir.1983), cert. denied, 465 U.S. 1080, 104 S.Ct. 1444, 79 L.Ed.2d 764 (1984) (citing Forester v. Consumer Product Safety Commission, 559 F.2d 774, 787-88 (D.C.Cir.1977)). We see no basis for such a contention. The proposal was clear on its face, and with or without further discussion by the ICC petitioners had a full opportunity to address it.
 
 
 18
 Petitioners also contend that the ICC's ultimate adoption of the proposal was inadequately justified. The text of the amendment and the ICC decision, however, both refer to the goal of permitting efficient operations. 49 C.F.R. Sec. 1152.32(m)(1); Revision of Abandonment Regulations, 367 I.C.C. at 834-35. That is an entirely comprehensible justification, and no more was needed to meet the APA requirement that agencies "incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. Sec. 553(c).
 
 Equipment Value
 
 19
 In both subsidy and abandonment proceedings, the ICC calculates the avoidable costs of using equipment to provide transportation across the part of the line to be abandoned. 49 C.F.R. Sec. 1152.32(g), (h), (n), (o). In order to do so, it must determine the value of the equipment. The amended regulations provide that equipment value is to be determined by calculating the cost of new equipment adjusted for accumulated depreciation ("depreciated replacement cost"). 49 C.F.R. Sec. 1152.32(g)(3)(i), (h)(1), (n)(2), (o). Petitioners argue that the ICC acted arbitrarily and capriciously in prescribing this method of valuation instead of using the equipment's actual market value. They do not seriously contend that depreciated replacement cost, which is of course widely used for ratemaking purposes, is an intrinsically unreasonable methodology, but they argue that used market value would be more accurate.
 
 
 20
 In rejecting this alternate method, the ICC concluded that used market value would be "too difficult to [determine] ... given the necessity of appraising each piece of equipment on the line." Revision of Abandonment Regulations, 367 I.C.C. at 832; cf. Chicago & North Western Transportation Co.--Abandonment, 366 I.C.C. 373, 376 (1982) (rejecting the "used market value" standard as "impractical"). Petitioners reply that there would be no need for individual appraisal, because the ICC could rely on "price quotes" for comparable used equipment to determine equipment value. But petitioners do not explain how used equipment might be determined to be "comparable" without individual examination of the equipment on the line, and we presume it is this problem the ICC had in mind when it concluded that a "used market value" standard was impractical. Absent indication, or even contention, that the generally accepted depreciated replacement cost methodology is for some reason significantly inaccurate in application to railroad equipment, we think administrative efficiency is reason enough to prefer it.
 
 Cost of Capital
 
 21
 As noted earlier, Sec. 10905(d)(2)(A) requires the ICC to allow, in subsidy determinations, "a reasonable return on the value of the line." The regulations apparently require that this same factor, computed in the same fashion, be taken into account in abandonment determinations, as part of the "burden to the railroad" of the continuing service for purposes of Sec. 10903's "public convenience and necessity" finding. See 49 C.F.R. Secs. 1152.22(d), 1152.30(a), 1152.35, 1152.36. Petitioners make two objections to that portion of the regulations, Sec. 1152.35, which provides for the manner of that computation. Both pertain to the calculation of the cost-of-capital figure, by which the invested capital ("investment base") is multiplied in order to obtain the "reasonable return on value."[1]
 
 
 22
 The first step the Commission takes in calculating the cost of capital is to determine, through methodologies not at issue here, what rate of return the railroad must currently pay to obtain money on the open market, through issuance of bonds and stock either in the proportion reflected in the railroad's own capital structure or in the average proportion for the industry. The component of that rate representing stock (equity capital) is increased, however, in order to produce the rate at which the railroad must earn on its invested capital in order to pay dividends on the stock at the market rate. Petitioners object to the methodology by which this augmentation is achieved. Specifically, they assert that the regulations are wrong in prescribing that the conversion from the reasonable post-tax dividend rate to the corresponding pre-tax earnings rate be conducted on the assumption that the railroad pays federal and state taxes at the statutory rates normally applicable to its level of income, since in fact (as all the parties agree) by reason of available deductions railroads pay taxes at far less than the statutory rates.
 
 
 23
 This issue is presented to us in a peculiar posture, which gives no occasion to pass upon the basics of the Commission's scheme. Petitioners have assigned as error neither the principle of augmentation for income taxes; nor the regulations' failure to limit the augmentation to take account of the fact that the capital invested on a line properly asserted to be abandonable would necessarily account for a less-than-proportionate degree of revenues and thus contribute less than proportionately to the rate of taxation; nor even the regulations' failure to use the actual overall tax rate of the particular railroad. Petitioners' only complaint before us is that use of the statutory tax rate is arbitrary and capricious because it does not produce, as it is intended to, an accurate assessment of the industry-wide cost of capital.
 
 
 24
 Counsel for the ICC contends that the assignment of error is not properly before us because the point was not raised in the proceedings before the Commission, where petitioners insisted that the actual tax rates of the particular railroad had to be used. It is well established, of course, that "[s]imple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." United States v. L.A. Tucker Truck Lines, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952). Petitioners respond that they did object before the Commission to the use of statutory tax rates, and specifically pointed out that to their knowledge no railroad pays taxes at those levels. They argue that, even if they did not suggest the particular alternative of using industrywide average rates, the Tucker Truck principle does not require such a suggestion. We agree that the particular alternative urged on appeal as the remedy for petitioners' objection need not have been presented to the agency--at least where, as here, that alternative is an obvious one. (The ICC has provided for the use of industry-wide figures in other parts of both subsidy and abandonment calculations, see 49 C.F.R. Sec. 1152.35(a)(1), (3).) The problem in the present case, however, is not that the remedy petitioners suggested before the agency (use of individual tax rates) is different from that which they urge in this appeal (use of industry-wide average tax rates); but that the remedy suggested there was addressed to a quite different objection. Petitioners' challenge to the use of statutory tax rates was based, not, as it is here, upon the failure of those rates to produce an accurate picture of industry-wide cost of capital; but upon the contention (which they have abandoned here) that, for capital and everything else, industry-wide costs are irrelevant, and only the individual company's costs should be considered. In other words, their objection was to what the use of the statutory tax rate sought to achieve (industry-wide cost of capital) and not to the imprecision of that means for achieving it. It would not have occurred to the Commission that the revision petitioners now urge would have met that objection--which the Commission addressed instead on its analytic merits. Perhaps the use of industry-wide average tax rates is both a more accurate and an administratively feasible method of calculating industry-wide pre-tax cost of capital; perhaps not. But the Commission's failure to address the point was not a failure to deal completely with an objection presented below. We agree with the Commission that this assignment of error is not properly before us.
 
 
 25
 Petitioners also argue that the amended regulations are contrary to the ICC's statutory mandate because they permit railroads to recover nominal rates of interest--i.e., the actual rates a lender would charge, including the portion that does no more than take account of anticipated inflation. Since the asset value that is multiplied by these rates in order to compute the cost of capital is not the assets' original purchase price but their current replacement cost, which continually reflects, of course, the effects of inflation, petitioners assert that the consequence is to "double-count" inflation, citing Farmers Union Central Exchange, Inc. v. FERC, 734 F.2d 1486, 1523-25 (D.C. Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 507, 83 L.Ed.2d 398 (1984). The ICC opinion dealt with this objection as follows:
 
 
 26
 NYDOT notes that the Commission has determined that the use of the nominal cost of capital when combined with the replacement cost investment base may require an adjustment to avoid double counting inflation. See Ex Parte No. 393 (Sub-No. 1), Standards for Railroad Revenue Adequacy (not printed), served March 9, 1983; but see Reasonably Expected Cost, 365 I.C.C. 819 (1982). The Commission intends to address this problem and harmonize prior decisions in a new rulemaking under preparation in Ex Parte No. 274 (Sub-No. 11), Abandonment Regulations--Costing, to be issued shortly. NYDOT's comments will be considered in that proceeding.
 
 
 27
 Revision of Abandonment Regulations, 367 I.C.C. at 834 n. 6. But the Administrative Procedure Act required that the comments be considered in this proceeding. 5 U.S.C. Sec. 553(c). Deferring consideration of the double-counting issue would have been well and good so long as the final decision to which that issue related was deferred as well. But to make the decision now and consider the issue later is neither rational nor permissible under the APA. We vacate the regulations insofar as they apply nominal rates of return to inflation-sensitive valuation bases.
 
 Opportunity Costs
 
 28
 The regulations provide that the railroad "may, at its discretion, present evidence of its opportunity costs, if the assets engaged in the line proposed to be abandoned could be used more profitably in some other capacity." 49 C.F.R. Sec. 1152.32(p). We confess to be perplexed regarding the nature and purpose of this showing, which is apparently relevant only to the abandonment determination, where it is not "added directly to other costs to determine the profitability of the line," but is "a separate, distinct factor to be balanced with (rather than added to) other factors in the abandonment equation." Revision of Abandonment Regulations, 367 I.C.C. at 838. Our perplexity is that once the cost of capital is calculated on an industry-wide rather than an individual-company basis, and using for the entire debt-capital portion of the equation current debt financing rates (rather than, as is customary in ratemaking, using the issued bond rates for that part of debt capital already raised), we can see little if any difference between so-called "opportunity costs" and cost of capital invested in the line. The Commission evidently suffers from the same perplexity, and some of its opinions seem simply to substitute opportunity costs for the cost-of-capital calculation. See, e.g., Chicago & North Western Transportation Co.--Abandonment, 366 I.C.C. at 378 ("Taking CNW's opportunity cost of $202,743 into consideration, we conclude that the revenues generated by the line would therefore be inadequate to cover fully all costs of operation and projected increased maintenance costs, and still provide for an adequate rate of return on the value of the rail property.").
 
 
 29
 Whatever this peculiar factor may be, however, petitioners' challenge to the regulations' treatment of it is the same as their first challenge to the cost of capital: use of statutory tax rates rather than industry-wide average rates to convert post-tax rate of return to pre-tax rate of return. See 49 C.F.R. Sec. 1152.32(p); Abandonment of Railroad Lines--Use of Opportunity Costs, 365 I.C.C. 902 (1982). Here, as there, the challenge was not presented to the Commission and hence cannot be considered by this court.
 
 
 30
 For the reasons stated, the regulations under review are vacated in part and remanded to the ICC for further proceedings consistent with this opinion.
 
 
 31
 So ordered.
 
 
 
 *
 Judge Tamm died before the final decision of this case
 
 
 [1]
 With respect to capital invested in rolling stock, the "reasonable return on value" is, perhaps peculiarly, included as an element of avoidable cost rather than shown within the separate category of "return on value" as such. Since cost of capital is required to be calculated in the same fashion for purposes of that computation, see 49 C.F.R. Sec. 1152.32(g)(3)(ii), (h)(2), (n)(2), the objections here discussed apply to that element of avoidable cost as well