Victor J. POLICH and Paul Warfel, et al., Plaintiffs,

v.

BURLINGTON NORTHERN, INC., and Burlington Northern Railroad Company, Delaware corporations, Defendants.

No. CV–86–044–BU–PGH.

United States District Court, D. Montana, Butte Division.

Nov. 15, 1995.

Alexander Blewett, III, Hoyt & Blewett, Great Falls, MT, for plaintiffs.

Randy J. Cox, Boone, Karlberg & Haddon, Missoula, MT, for defendants.

Randy J. Cox, (See above), for Burlington Northern Railroad Company, a Delaware corporation, defendant.

## MEMORANDUM AND ORDER

HATFIELD, Chief Judge.

Burlington Northern Railroad Company and Burlington Northern, Inc. (collectively referred to as "Burlington Northern"), interstate railroad carriers, previously maintained locomotive repair shop facilities in Livingston, Montana, related to the carrier's former operation of the "southern line" across a portion of Montana.[1] The Burlington Northern also maintained a terminal at Livingston, Montana, for the handling of freight and dispatching of train crews. In February of 1986, the Burlington Northern closed its Livingston shop facilities. Subsequently, on October 31, 1987, the Burlington Northern sold its Montana southern line to an entity identified as Montana Rail Link.[2] The plaintiffs are individuals formerly employed by the Burlington Northern either at the shop facilities or terminal maintained by the Burlington Northern at Livingston. By way of their complaint, as amended a third time, the plaintiffs assert the Burlington Northern's closure of the Livingston shop facilities and the terminal constitutes a "move" of a railroad "terminal" within the meaning of Mont.Code Ann. § 69–14–1002 (1987), which plaintiffs claim entitles them to be compensated for the diminution in the value of their respective residences resulting from the closure of the "terminal".[3] The matter is presently before the court upon cross-motions for summary judgment, each of the parties seeking judgment, as a matter of law, upon the issue of whether the Burlington Northern's closure of its Livingston facilities constituted the "move" of a "terminal" within the meaning of Mont.Code Ann. § 69–14–1002 (1987). In addition, Burlington Northern seeks summary judgment upon the following alternate bases: (1) application of Mont.Code Ann. § 69–14–1002 (1987) to the Burlington Northern's closure of its Livingston facilities is preempted by the Interstate Commerce Act ("ICA"), 49 U.S.C. §§ 10101–11917 (1988); (2) application of Mont.Code Ann.

1. The "southern line," a rail line which ran from the Midwest to Seattle, Washington, included a 544–mile stretch of main rail line from Huntley, Montana, to Sandpoint, Idaho, together with 286 miles of branch lines.

2. The Burlington Northern's sale of its southern line to Montana Rail Link was authorized by the Interstate Commerce Commission. *See, Montana Rail Link, Inc.—Acquisition and Operation—Certain Lines of Burlington Northern Railroad,* Finance Docket No. 3109 (July 31, 1987).

3. Title 69, Chapter 14 of the Montana Code Annotated (1987), governed the operation of railroads in the State of Montana at the time pertinent to this action. Mont.Code Ann. § 69–14–1002 (1987), entitled *Compensation of Employees on Removal of Railroad Division Point or Terminal,* provided as follows:

(1) Except as provided in subsection (2), when any railroad or railway company operating its line of road in, into, or through the State shall move any of its division points or terminals, it shall be liable to any employee of such railroad or railway company for any damages sustained by such employee by reason of any decrease in value of any real property actually occupied by such employee as his place of residence, which decrease in value shall be caused by reason of the removal of such division point or terminal; provided, such employee shall have in such property so damaged an estate of freehold. Such damages shall be collectible in any court of competent jurisdiction.

(2) When any railroad or railway company in good faith determines upon a change or removal of any division point or terminal and in good faith posts prominently about its stationhouse, shops, and yards a statement of its intention to do so, in such manner as to give reasonable notice thereof to such employee, it shall not be liable, as hereinbefore provided, for any decrease in value of any interest in any property purchased after the time of such posting provided that such division point or terminal shall be changed or removed within six months after the date of such posting.

§ 69–14–1002 (1987) to the Burlington Northern's closure of its Livingston facilities is preempted by the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151–163 (1983); (3) Mont.Code Ann. § 69–14–1002 (1987) violates the Commerce Clause of the United States Constitution; (4) Mont.Code Ann. § 69–14–1002 (1987) violates the right of the Burlington Northern to equal protection of the law as protected by the Fourteenth Amendment to the United States Constitution; (5) the plaintiffs are not individuals falling within the purview of Mont.Code Ann. § 69–14–1002 (1987), and to whom the Legislature of the State of Montana intended to extend the benefit embodied in the referenced statute; (6) Mont.Code Ann. § 69–14–1002 (1987) constitutes "special legislation" proscribed by Article V, Section 12 of the Montana Constitution (1972) (formerly Article V, Section 26 of the Montana Constitution (1889)).

## BACKGROUND

This action was initially prosecuted by the plaintiffs, as former employees of the Burlington Northern, and their spouses, all of whom resided in Livingston, Montana. The original complaint advanced claims for actual and constructive fraud emanating from the Burlington Northern's alleged promise to employees, and those employees' spouses, that it would keep its Livingston facilities open and operational; a promise purportedly made during the course of two different corporate reorganizations.[4]

The Burlington Northern moved to dismiss the original complaint on the ground the plaintiffs' claims were preempted by the ICA and the RLA. Prior to disposition of the motion to dismiss, the plaintiffs moved this court to file a third amended complaint to include allegations that Burlington Northern violated Mont.Code Ann. § 69–14–1002 (1987). This court denied the plaintiffs' motion requesting leave to file a third amended complaint, and dismissed the action in its entirety. The plaintiffs appealed.

The Ninth Circuit Court of Appeals affirmed that aspect of this court's judgment dismissing the plaintiffs' claims predicated upon fraud and constructive fraud, concluding the claims of the employee-plaintiffs were preempted by the RLA. *Polich v. Burlington Northern, Inc.,* 942 F.2d 1467, 1470–71 (9th Cir.1991). The appellate court further held the claims of the employee-plaintiffs were properly dismissed for failure to state a claim upon which relief could be granted. *Id.,* at 1471–72. The appellate court, however, reversed the judgment to the extent it pertained to the employee-plaintiffs' request for leave to file an amended pleading for the purpose of advancing a claim for relief under Mont.Code Ann. § 69–14–1002 (1987). *Id.,* at 1472–73. The appellate court concluded this court had erred when it dismissed this action, in its entirety, without affording the employee-plaintiffs leave to amend their complaint to add a cause of action pursuant to Mont.Code Ann. § 69–14–1002 (1987), stating as follows:

> [Employee-plaintiffs] have stated a cause of action pursuant to the Montana statute, and the amendment should have been permitted. If the statute is invalid as a burden on commerce, or is subject to some other defense, those questions can be resolved in the trial court.

*Polich, supra,* 942 F.2d at 1472.[5] In so doing, the appellate court held the claims

4. The first corporate reorganization occurred in 1970, when Burlington Northern, Inc. (the predecessor to Burlington Northern Railroad Company) was created as the result of a merger, approved by the Interstate Commerce Commission, among several railroads including the Great Northern Railroad Company, the Chicago, Burlington & Quincy Railroad Company, and the Northern Pacific Railroad Company. The second reorganization occurred in 1980, when the Burlington Northern, Inc., merged with the St. Louis–San Francisco Railway Company.

5. The employee-plaintiffs filed their original complaint based solely upon Burlington Northern's closure of the locomotive repair shop facilities. After the filing of the original

of the employee-plaintiffs under the Montana statute were not preempted by the RLA. 942 F.2d at 1473. Because of its holding that the employee-plaintiffs' state statutory claim was not preempted by the RLA, the court proceeded to address the issue of preemption under the ICA. 942 F.2d at 1473. The appellate court stated its conclusion relative to the issue of whether the ICA preempted the employee-plaintiffs' state statutory claim in the following terms:

> [Employee-plaintiffs] claim under the Montana statute has no connection with violation of any provisions of a *merger*. The statute provides that employees should be compensated for the loss in value of their homes anytime a railroad closes a terminal in the state, regardless of the reason for the closure. [Employee-plaintiffs] do not need to show any wrongdoing on the part of the railroad to recover under this statute, and arguments regarding approval of the *merger* have no relevance to this claim. Thus, this claim is not preempted by jurisdiction of the [Interstate Commerce Commission]. (Emphasis supplied).

942 F.2d at 1473.

Upon remand, the employee-plaintiffs filed a third amended complaint advancing their respective claims for relief under Mont.Code Ann. § 69–14–1002 (1987). The parties advocate quite differing interpretations of the appellate court's decision as applicable to the facts now before this court. The employee-plaintiffs, in what is tantamount to a "law of the case" argument, take the position the appellate court's decision resolved all legal issues relating to the application of Mont.Code Ann. § 69–14–1002 (1987) to Burlington Northern's closure of its Livingston facilities, as well as all legal issues relating to whether application of the statute is preempted by the ICA or the RLA. Consequently, in the employee-plaintiffs' opinion, summary judgment upon the issue of liability is appropriate, with only the damage claim of the individual employee-plaintiffs remaining to be determined. The employee-plaintiffs essentially dismiss, as without merit, the equal protection, commerce clause, and "special statute" challenges mounted by the Burlington Northern to the application of Mont.Code Ann. § 69–14–1002 (1987).

The Burlington Northern, on the other hand, takes the position the appellate court's decision is not properly viewed as determinative of all issues relating to the application of Mont.Code Ann. § 69–14–1002 (1987) to Burlington Northern's sale of the Montana southern line to Montana Rail Link, and the concomitant cessation of Burlington Northern's operation of the Livingston "terminal". The Burlington Northern finds support for its position in the appellate court's statement acknowledging that "if [Mont.Code Ann. § 69–14–1002 (1987) ] is invalid as a burden on commerce, or is subject to some other defense, those questions can be resolved in the trial court." 942 F.2d at 1472. The Burlington Northern also emphasizes that the appellate court's decision was obviously limited to the facts of the record before that tribunal; a record which did not include facts relating to the Burlington Northern's sale of its Montana southern line to Montana Rail Link.[6] Finally, the

complaint, the Burlington Northern, as previously noted, effected the sale of the Montana southern line to Montana Rail Link.

6. Burlington Northern suggests the appellate court failed to appreciate the closure of the locomotive repair shops was a transaction entirely separate and apart from the subsequent sale of the Montana southern line, and the concomitant cessation of Burlington Northern's operation of the Livingston "terminal". This court, being unaware of the

precise arguments presented by the parties on appeal, is in no position to comment upon this aspect of Burlington Northern's argument. The court notes, however, that no mention of the sale or the successor's operation of a "terminal" at the Livingston situs is found anywhere in the decision, let alone in the court's analysis of the preemption issues raised by Burlington Northern under both the ICA and the RLA. In that regard, the court finds it imperative to note, as previously em-

Burlington Northern emphasizes the record before the appellate court contained limited information regarding the express provisions of the collective bargaining agreements and the employee-plaintiffs, grouped by union affiliation, and particularly those provisions pertaining to protective benefits relating to an employee's residential real estate. The precise terms of the pertinent collective bargaining agreements, the Burlington Northern urges, bear significantly upon the preemption analysis under the RLA.[7]

## DISCUSSION

### A. INTERSTATE COMMERCE ACT PREEMPTION

The appellate court's ICA preemption analysis focused upon the referenced 1970 and 1980 mergers which resulted in the formation of Burlington Northern, Inc.; mergers approved by the Interstate Commerce Commission ("ICC"). 942 F.2d at 1473. Focusing upon the fraud claims of the employee-plaintiffs and the plaintiff-spouses, the court held that "to the extent that appellants' claims stem from alleged fraud in connection with the ICC's approval of the mergers, the ICC has exclusive jurisdiction." 942 F.2d at 1473. The court proceeded to hold, however, that the em-

ployee-plaintiffs' claims under Mont.Code Ann. § 69–14–1002 (1987) were not preempted by jurisdiction of the ICC because those claims had no "connection with violation of any provisions of a merger." 942 F.2d at 1473.

As noted, the third amended complaint filed by the employee-plaintiffs advances those individuals respective claims for relief pursuant to Mont.Code Ann. § 69–14–1002 (1987). The operative allegations of the third amended complaint state as follows:

6. Some time prior to February, 1986, [Burlington Northern] decided to shut down its railroad shops and terminal in Livingston, Montana, and between February, 1986, and November 1, 1987, [Burlington Northern] closed its shops and closed and removed its terminal at Livingston, Montana.

7. Pursuant to section 69–14–1002, M.C.A. (1987), plaintiffs are entitled to damages due to the decrease in value of their real property occupied by them as their place of residence, which decrease in value was caused by [Burlington Northern's] scheme of removing its terminal at Livingston, which scheme com-

phasized, that the appellate court's discussion of the ICA preemption issue references only "ICA merger provisions," referring to the Interstate Commerce Commission's approval of the 1970 and 1980 mergers resulting in the formation of Burlington Northern, Inc. 942 F.2d at 1473.

7. In previously analyzing whether the employee-plaintiffs' fraud claims were preempted by the RLA, this court, as the appellate decision accurately reflects, had before it the affidavit of Maxine Timberman, Burlington Northern Railroad Company Assistant Director of Labor Relations. 942 F.2d at 1470. Timberman's affidavit attested to the fact that all employee-plaintiffs were covered by collective bargaining agreements at the time pertinent to the closure of the Livingston facilities, that all unions with affected members negotiated with Burlington Northern about all matters relating to employment termination or transfer, and that the closure of the Livingston facilities was conducted in accordance

with the applicable collective bargaining agreements. 942 F.2d at 1470–1471. The affidavit previously submitted by Timberman contained only one sample agreement, from 1964, which Timberman swore contained provisions typical of each collective bargaining agreement in force at the time pertinent to this action. 942 F.2d at 1470.

In presenting the motion for summary judgment now before the court, the Burlington Northern has submitted the affidavit of Timberman, the attachments to which include applicable portions of the collective bargaining agreements in force and effect between each union or group of unions affected by closure of the Livingston shops, i.e., Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees; International Brotherhood of Firemen and Oilers; System Federation No. 7, Railway Employees Department, AFL—CIO. The substance of the affidavit is undisputed by the employee-plaintiffs.

menced in February of 1986 and terminated on November 1, 1987.

The Burlington Northern contends application of Mont.Code Ann. § 69–14–1002 (1987) to the cessation of Burlington Northern's operation of its Livingston terminal is preempted by the ICA because the cessation resulted from an ICC approved sale of the Montana southern line to Montana Rail Link. Application of Mont. Code Ann. § 69–14–1002 (1987) to the cessation of Burlington Northern's operation of the Livingston terminal constitutes, in the opinion of Burlington Northern, the imposition of a labor protective benefit upon the sale which is a matter within the exclusive jurisdiction of the ICC. The court agrees.

Mont.Code Ann. § 69–14–1002, initially enacted by the Legislative Assembly of the State of Montana in 1921 (Sect.1, Chapt. 159, L.1921), has, since its enactment, been recodified, without change, in the various statutory codes of the State of Montana. The court's analysis of the preemption issue presented must necessarily begin with a construction of Mont.Code Ann. § 69–14–1002 (1987). The court undertakes this task recognizing that its function in construing a statute is to ascertain and effect legislative intent. *See, Dorn v. Bd. of Trustees of Billings School Dist. No. 2,* 203 Mont. 136, 661 P.2d 426, 430 (1983); *State Bar of Montana v. Krivec,* 193 Mont. 477, 632 P.2d 707, 710 (1981).

■ Statutes, of course, "can be expressed only in words and such words must be reasonably and logically interpreted according to grammatical and statutory rules." *Krivec,* 632 P.2d at 710. If the definition of a term utilized in a statute is set forth in the statute, that statutory definition controls the meaning to be afforded the term to the exclusion of what might be the commonly accepted or dictionary definition of the term. *See, Krivec,* 632 P.2d at 710. Absent a statutory definition, how-

ever, the words of a statute must be accorded their ordinary or common meaning. *Norfolk Holdings Inc. v. Mont. Dept. of Revenue,* 249 Mont. 40, 813 P.2d 460, 462 (1991); *State ex rel Roberts v. Public Service Comm.,* 242 Mont. 242, 790 P.2d 489, 492 (1990). If the statutory term under scrutiny has both a popular and a trade or technical meaning, the trade or technical meaning is to be used in construing a statute having reference to that trade. *Haynie v. No. Pacific Ry. Co.,* 158 Mont. 247, 490 P.2d 715, 716 (1971).

The term of immediate importance in the present analysis is the term "terminal" as used in Mont.Code Ann. § 69–14–1002 (1987). The term is not defined in the statute itself or any related statute.[8] Consistent with the rules of statutory construction discussed, the term "terminal," as used in the statute, should be accorded the ordinary meaning accorded the term in the context of the operation of a railroad. In that regard, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1216 (10th ed.1995), accords the word "terminal" the following two pertinent definitions:

(a) either end of a carrier line having facilities for the handling of freight and passengers;

(b) a freight or passenger station that is central to a considerable area or serves as a junction at any point with other lines.

■ In construing Mont.Code Ann. § 69–14–1002 (1987), the court finds the word "terminal," as used in the statute, is properly considered to mean a facility or station utilized by a railroad or railway company for the handling of freight and/or passengers. Consistent with this conclusion, the court must reject the notion advocated by the employee-plaintiffs that Mont. Code Ann. § 69–14–1002 (1987) should be construed to include the locomotive repair facility formerly maintained by the Bur-

---

**8.** The court also notes the lack of any recorded legislative history attendant to the original enactment, or any subsequent reenactment, of the statute.

lington Northern at Livingston, Montana.[9] Consequently, resolution of the ICA preemption issue focuses solely upon Burlington Northern's cessation of its operation of the Livingston terminal upon the sale of its Montana southern line to Montana Rail Link.

■ The ICA gives the Interstate Commerce Commission exclusive authority to regulate mergers, sales, acquisitions and abandonments by rail carriers. *See, Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 319–21, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981). In the context of such transactions, the ICC has the authority, pursuant to 49 U.S.C. § 10901(a)[10] to impose labor protective conditions in its discretion.[11] Certain transactions involving railroads may, however, be exempted from the re-

quirements of the ICA altogether pursuant to 49 U.S.C. § 10505.[12]

In a 1985 rule-making proceeding, the ICC exempted from regulation under section 10901 the entire class of transactions involving acquisitions by "new-carriers". *Ex Parte 392* (sub no. 1), Class Exemption for the Acquisition and Operation of Rail Lines under 49 U.S.C. § 10901, 1 ICC 2d 810 (1985) [hereinafter *Ex Parte 392* ], *review denied mem. sub nom., Illinois Commerce Comm. v. ICC,* 817 F.2d 145 (D.C.Cir.1987).[13] Under *Ex Parte 392,* an exemption becomes effective and a transaction is deemed approved after seven days following the filing of a notice by the acquiring entity unless a petition to revoke the exemption has been granted or the transaction is stayed by the ICC. *Id., citing,* 49 U.S.C. § 10505(d); 49 C.F.R.

9. The construction accorded the statute by the court is also consistent with the principle of *expressio unius est exclusio alterius,* the maxim of statutory construction which recognizes that the express mention of one or more items of a class and the exclusion of other items of the same class implies legislative intent to exclude the items not expressly mentioned. *See, Helena Valley Irrigation Dist. v. State Highway Comm.,* 150 Mont. 192, 433 P.2d 791, 794 (1967); *Stephens v. City of Great Falls,* 119 Mont. 368, 175 P.2d 408, 413–14 (1947). The statute expressly includes "terminals" and "division points", but no other specific facility or location relating to the operation of a railroad.

10. Section 10901(a) states, in its entirety:
The Commission may require any rail carrier proposing both to construct and operate a new railroad line pursuant to this section to provide a fair and equitable arrangement for the protection of the interests of railroad employees who may be affected thereby no less protective of and beneficial to the interests of such employees than those established pursuant to section 11347 of this Title [pertaining to mergers and consolidations]. 49 U.S.C. § 10901(a) (1988).

11. In some instances, the imposition of labor protective conditions is mandatory, *i.e.,* certain mergers and consolidations. 49 U.S.C. § 11347. In other situations, imposition of labor protective provisions rests within the discretion of the ICC. *E.g.,* where a rail carrier proposes to construct or operate a new railroad line. 49 U.S.C. § 10901. For a dis-

cussion of typical substantive labor protective conditions traditionally imposed by the ICC, *see, New York Dock Ry. v. United States,* 609 F.2d 83 (2d Cir.1979). *See also,* 49 U.S.C. § 11347.

12. Title 49 U.S.C. § 10505(a) provides:
(a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle—
(1) is not necessary to carry out the transportation policy of section 10101(a) of this title; and
(2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.

13. Prior to *ex parte 392,* the ICC had routinely granted exemptions from the requirements of section 10901 to non-carrier acquisition transactions on a case-by-case basis. *See, Railway Executives Assn. v. Pittsburgh & Lake Erie R.R.,* 845 F.2d 420, 435 (3d Cir.1988), *reversed on other grounds,* 491 U.S. 490, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989). *Ex parte 392* stemmed from a desire on the part of the ICC to "meet the need for expeditious handling of a large number of requests that are rarely opposed." *Id.*

§§ 1150.32(b), 1150.34; and 1 ICC2d 810, 820. Furthermore, in *Ex Parte 392,* the ICC declared that only in an "extraordinary case," given "an exceptional showing of circumstances," would it impose labor protection on a transaction approved under section 10901. 1 ICC2d at 815.

In *Citizens Alliance to Save the South Line v. Montana Rail Link,* cause No. 87–74–H–CCL (D.Mont., decided June 27, 1990), this court previously detailed the history relative to the ICC's approval of Montana Rail Link's acquisition of Burlington Northern's Montana southern line, *see, Montana Rail Link. Inc.—Exemption Acquisition and Operation—Certain Lines of Burlington Northern R.R. Co.,* Finance Docket No. 31089, 2–3 (July 30, 1987), observing:

> Pursuant to federal law, [Montana Rail Link] filed a verified notice of exemption with the Interstate Commerce Commission (ICC) on July 24, 1987, ... seeking to avail itself of the streamlined method of ICC approval provided by 49 U.S.C.s § 10505. At the time [Montana Rail Link] filed the notice of exemption, the Code of Federal Regulations provided that ICC approval became automatically effective seven days after the notice of exemption was filed. 49 C.F.R. § 1150.35 (1987).... On July 24, 1987, [the Montana Public Service Commission] filed a petition with the ICC to stay the exemption of the South Line transfer. On July 29, 1987, both the Montana Department of Commerce and plaintiffs filed similar petitions with the ICC.... The ICC denied all three petitions on July 31, 1987. The petitioners later filed petitions to revoke the ICC exemptions. After a period of notice and comment, which included three days of hearings on which sixty-nine individuals testified, the ICC denied the petitions for revocation.

Opinion at pp. 2–4 n. 2.

The Burlington Northern contends that the ICC, in effectively exempting Montana Rail Link's acquisition of the Montana southern line from regulation under 49 U.S.C. § 10901, exempted the entire transaction from regulation under section 10901; an exemption which, consistent with *Ex Parte 392,* operated to exempt the entire transaction from those provisions of the ICA requiring the imposition of labor protective conditions. The imposition of a liability via Mont.Code Ann. § 69–14–1002 (1987) upon either party to the transaction would, in the opinion of Burlington Northern, constitute an infringement upon the exclusive jurisdiction of the ICC.

The employee-plaintiffs retort the Burlington Northern's ICA preemption argument is wrong for three reasons. First, they suggest 49 U.S.C. § 10901 is inapplicable to the transaction at issue because the transaction involved the sale of an existing line, and not the construction and operation of a new railroad line within the meaning of 49 U.S.C. § 10901(a). Second, they argue that the ICC, in its approval of the transaction, did not "enter into" the area of labor protective conditions. Finally, they implore the court to conclude that imposition of liability upon the Burlington Northern pursuant to Mont.Code Ann. § 69–14–1002 (1987), relative to the transaction, would not be inconsistent with the ICC's approval of the transaction.

The analytical framework which this court must employ in determining whether the ICA preempts application of Mont. Code Ann. § 69–14–1002 (1987) to the Burlington Northern's sale of its Montana southern line to Montana Rail Link was summarized by the Supreme Court in *Kalo Brick & Tile Co., supra,* as follows:

> [W]hen Congress has chosen to legislate pursuant to its constitutional powers, then a court must find local law preempted by federal regulation whenever the "challenged state statute 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Perez v. Campbell,* 402 U.S. 637, 649, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), *quoting, Hines v. Davidowitz,* [312 U.S. 52 at 67,

61 S.Ct. 399, 85 L.Ed. 581 (1941)]. Making this determination "is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict." *Perez v. Campbell, supra,* at 64, 91 S.Ct. 1704. And in deciding whether any conflict is present, a court's concern is necessarily with "the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted." *San Diego Building Trades Council v. Garmon,* [359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775(1959)] at 243.

450 U.S. at 317–18, 101 S.Ct. 1124.

In the specific context of the ICA, the Court in *Kalo* observed "the Interstate Commerce Act is among the most pervasive and comprehensive of federal regulatory schemes" and "state efforts to regulate commerce must fall when they conflict with federal authority over the same activity." 450 U.S. at 318–19, 101 S.Ct. 1124. Because the authority of the ICC to regulate Burlington Northern's sale of its southern line to Montana Rail Link is exclusive, the determinative issue is whether there exists a conflict between the Commission's authority in approving that sale and the application of Mont.Code Ann. § 69–14–1002 (1987) to the sale.

Congress enacted the ICA in 1887, beginning almost a century of comprehensive regulation of interstate transportation. In more recent years, however, Congress has enacted several deregulatory statutes in response to certain concerns of the railroad industry. *See, e.g.,* the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31, and the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895. Those Acts drastically reduce the amount of federal involvement in rail mergers and acquisitions, in an effort to implement the congressional policy favoring expedited approval of sales of railroads, particularly of railroads that are in danger of failing. *P & Lake Erie,* *supra,* 845 F.2d at 442, *citing,* H.R.Conf. Rep. No. 1430, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.C.C.A.N. 3978, 4110.

The streamlined expedited approval process of *Ex Parte 392, supra,* pp. 5–6, utilized by the ICC in exempting the sale transaction between Burlington Northern and Montana Rail Link is an outgrowth of, and consistent with Congress' recent deregulatory efforts. The question which remains is whether the ICC's actions, in exempting the sale from regulation under 49 U.S.C. § 10901, and declining to impose substantive labor protective conditions, preempts application of Mont.Code Ann. § 69–14–1002 (1987), because imposition of the liability created by that statute upon Burlington Northern would conflict with the ICC's exercise of its authority. The answer is yes.

In the exercise of the authority granted it by the ICA, the ICC amended the regulations (49 C.F.R. §§ 1150 *et seq.*) governing transactions subject to regulation under 49 U.S.C. § 10901. *See, Ex Parte 392, supra.* In so doing, the ICC explained:

> Exercising our discretion to not impose employee protection on this class of transactions is consistent with congressional intent. (footnote omitted). In drafting the Staggers Act, Congress chose note to burden certain new operators with labor protection costs. *** Prior to the late 1970's, the Commission did not have a clear policy concerning imposing employee protective conditions on a seller. *** Faced with the need to encourage continuation of rail service, the Commission adopted the present policy of not imposing conditions on the buyer or the seller (footnote omitted). We reason that there are costs associated with labor protection, and these costs would result in an increased selling price. Thus, the acquirer would indirectly bear these costs. In addition, in transactions under section 10901, operations are continuing and jobs for rail employees will continue to be available. Thus, railroads seeking to rid them-

selves of marginal lines should be encouraged to sell to shippers, short lines, communities, and other main line carriers who seek to continue operations over these lines. If labor protective conditions are imposed, the economic justification for transfer of the line is diminished if not negated. Accordingly, for these reasons and the reasons discussed above, no conditions will be imposed as a matter of course on the seller in a proposal using this class exemption. *** In view of labor's lack of demonstrated need, the availability of revocation, congressional and Commission policies encouraging continued rail operations, and the likelihood that labor conditions would jeopardize the transaction and the economics of continued operations, we will exercise our discretion and not impose employee protective conditions on this class of transactions. *** In an extraordinary case, a protesting labor union may seek protection by way of petition to revoke under 10505(d). If an exceptional showing of circumstances justifying the imposition of labor protection is made, the Commission is empowered to revoke the exemption, in whole or in part, and impose labor protection. *** We conclude that exemption of these transactions will foster the rail transportation policy of 49 U.S.C. § 10101(a) by minimizing the need for Federal regulatory control over the rail transportation system, ensuring the development and continuation of a sound rail transportation system, fostering sound economic conditions in transportation, reducing regulatory barriers to entry, and encouraging efficient rail management. Therefore, we find that the continued regulation of acquisitions and operations under 49 U.S.C. § 10901 is not necessary to carry out the national rail transportation policy.

1 ICC2d at 814–17.

Contrary to the assertion of the employee-plaintiffs, the ICC, by exempting the subject transaction from regulation under 49 U.S.C. § 10901, exercised its authority, via *Ex Parte 392, supra,* to not impose labor protective conditions upon the transaction. The imposition of liability, pursuant to Mont.Code Ann. § 69–14–1002 (1987), upon the Burlington Northern Railroad relative to its sale of the Montana southern line would constitute the regulation of an activity over which the ICC has exercised its exclusive authority.

The employee-plaintiffs vehemently argue no conflict exists between application of Mont.Code Ann. § 69–14–1002 (1987) and the ICC's approval of the subject sale with its attendant exemption from the imposition of labor protective conditions. In the opinion of the employee-plaintiffs, preemption is not appropriate because the ICC did not enter into the "arena" of providing protection to the employee-plaintiffs for any loss they may have sustained, in the form of diminished real estate values, caused by the cessation of Burlington Northern's operation of its terminal in Livingston. It is true that in approving Montana Rail Link's acquisition of the Montana southern line, the ICC did not expressly address the issue of whether employees of the Burlington Northern Railroad should be compensated for any damage, in the form of a diminution in the value of their respective residences, visited upon the employees because of the sale. The decision of the ICC, however, as embodied in *Ex Parte 392* and applied in the granting of an exemption under 49 U.S.C. § 10505, not to impose labor protective conditions upon the sale constituted the exercise of the plenary authority granted the ICC by the ICA. In this regard, the explanatory observations offered by the Supreme Court in *Kalo Brick & Tile Co.* relative to its discussion of the preemption doctrine bear repeating:

> The doctrine does not and could not in our federal system withdraw from the States either the "power to regulate where the activity regulated [is] a merely peripheral concern" of federal law, *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 243, 79 S.Ct. 773,

3 L.Ed.2d 775 (1959), where the authority to legislate when Congress could have regulated "a distinctive part of a subject which is peculiarly adapted to local regulation, ... but did not," *Hines v. Davidowitz,* 312 U.S. 52, 68, n. 22, 61 S.Ct. 399, 85 L.Ed. 581 (1941). But when Congress has chosen to legislate pursuant to its constitutional powers, then a court must find local law pre-empted by federal regulation whenever the "challenged state statute 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Perez v. Campbell,* 402 U.S. 637, 649, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), *quoting, Hines v. Davidowitz, supra,* at 67, 61 S.Ct. 399.

450 U.S. at 317, 101 S.Ct. 1124.

Contrary to the suggestion of the employee-plaintiffs, application of Mont.Code Ann. § 69–14–1002 (1987) to the Burlington Northern Railroad's sale of its Montana southern line to Montana Rail Link would constitute state regulation of the transaction which is inconsistent with federal law.

### B. REMAINING ISSUES

Because the court finds that the employee-plaintiffs claims under Mont.Code Ann. § 69–14–1002 (1987) are preempted by the ICA, the court need not address the other bases for summary judgment advanced by the Burlington Northern Railroad. Therefore,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the motion for summary judgment presented by the defendant. Burlington Northern Railroad Company, be, and the same hereby is GRANTED, and the plaintiffs' motion for summary judgment, accordingly, DENIED; that the plaintiffs take nothing by way of their complaint against the defendant, Burlington Northern, Inc., and that each party shall bear the costs of suit.